**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

METROPCS, INC., a Delaware
Corporation,
        *Plaintiff-Appellant-*
          *Cross-Appellee,*

      v.

THE CITY AND COUNTY OF SAN
FRANCISCO and THE BOARD OF
SUPERVISORS OF THE CITY OF SAN
FRANCISCO,
        *Defendants-Appellees-*
          *Cross-Appellants.*

Nos. 03-16759
     03-16760

D.C. No.
CV-02-3442 PJH

OPINION

Appeals from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
October 4, 2004—San Francisco, California

Filed March 7, 2005

Before: Richard D. Cudahy,* Susan P. Graber and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Cudahy;
Partial Concurrence and Partial Dissent by Judge Graber

---

*The Honorable Richard D. Cudahy, United States Circuit Judge for the
Seventh Circuit, sitting by designation.

2707

## COUNSEL

Martin L. Fineman, Davis Wright Tremaine LLP, San Francisco, California, for the plaintiff-appellant/cross-appellee.

William K. Sanders, Deputy City Attorney, San Francisco, California, for the defendants-appellees/cross-appellants.

James A. Heard, Mackenzie & Albritton LLP, San Francisco, California; Steven E. Grill, Devine, Millimet & Branch, P.A., Manchester, New Hampshire; Scott J. Grossberg, Cihigoyenetche, Grossberg & Clouse, Rancho Cucamonga, California; Paul J. Lawrence, Preston Gates & Ellis LLP, Seattle, Washington; and Daniel Pascucci, Fish & Richardson, P.C., San Diego, California, and Paul L. Weisbecker, Litigation Counsel, Cingular Wireless LLC, Atlanta, Georgia, for the amici curiae.

**OPINION**

CUDAHY, Circuit Judge:

MetroPCS brought the instant action in the District Court for the Northern District of California, alleging that a decision by the San Francisco Board of Supervisors denying MetroPCS permission to construct a wireless telecommunications antenna atop a city parking garage violated several provisions of the Telecommunications Act of 1996 (TCA). Specifically, MetroPCS alleged that the Board's decision (1) was not "in writing" as required by the TCA, (2) was not supported by substantial evidence, (3) constituted unreasonable discrimination among providers of functionally equivalent wireless services, (4) prohibited or had the effect of prohibiting the provision of wireless services and (5) was improperly based on environmental concerns about radio frequency (RF) emissions.

Both parties moved for summary judgment, and the district court granted the City's motion for summary judgment as to all claims except the prohibition claim, ruling that material questions of fact remained as to whether the Board's decision had the effect of prohibiting the provision of personal wireless services. Both parties now appeal the ruling below, and we affirm in part and reverse in part the district court's decision.

## I. *BACKGROUND*

This case marks yet another episode in the ongoing struggle between federal regulatory power and local administrative prerogatives — the kind of political collision that our federal system seems to invite with inescapable regularity. And as most often happens in such cases, the courts are summoned to re-strike the balance of power between the national and the local. More specifically, we are called upon to interpret several provisions of the TCA, an exegetical effort having implications for Federal Communications Commission (FCC)

licensing authority, wireless telecommunications companies and municipal zoning authorities alike. The stakes of the current dispute are especially high since this case involves several important questions of law that have not yet been authoritatively addressed by this Circuit.

The basic facts of this case are not in dispute. MetroPCS is a provider of wireless telecommunications services. It is licensed by the FCC to construct and operate radio transmitting and receiving facilities in San Francisco, Oakland and San Jose, California (the Bay Area). On January 15, 2002, MetroPCS submitted to the City of San Francisco's Planning Department an application for a Conditional Use Permit (CUP) to install six panel antennas on an existing light pole located on the roof of a parking garage at 5200 Geary Boulevard (the Geary site). The proposed facility was to consist of (1) six panel antennas mounted 53 feet above the sidewalk grade on an existing light pole on the roof of a 42-foot-high parking garage, and (2) equipment cabinets mounted on an existing wall on the garage roof. Each antenna was to be five feet long and painted to match the garage. The proposed installation was designed to improve MetroPCS's wireless service coverage in the Richmond District, where the Geary site is located. MetroPCS chose the Geary site after evaluating the technical feasibility of several sites in the area and considering community objections to alternative site locations.

Under the San Francisco Planning Code, the Geary site is located within an "NC-3" or "Moderate Scale Neighborhood Commercial District." In an NC-3 zoning district, a wireless facility (such as a panel antenna) is considered a public use that requires a CUP from the City Planning Commission. Because the Geary site is located on top of a commercial structure in an NC-3 zoning district, it is classified as a Location Preference 4 under the City's Wireless Telecommunications Facilities Siting Guidelines — it is neither a high-priority site nor a "disfavored" site. On April 18, 2002, the San Francisco Planning Commission held a public hearing to

consider MetroPCS's application for a CUP at the Geary site. At the close of the hearing, the Planning Commission voted to grant MetroPCS's application. The Planning Commission later adopted written findings and drafted a written decision. These findings included a determination that the proposed MetroPCS antenna facility is necessary to MetroPCS's service coverage in the Richmond District and "both necessary and desirable" for the community.

On May 20, 2002, Richmond District resident Robert Blum filed an appeal of the Planning Commission's decision with the City Board of Supervisors (the Board). Mr. Blum was joined by some 80 local property owners, representing almost 60% of the land area within 300 feet of the Geary site, who signed petitions in support of the appeal. Hundreds of other San Francisco residents also signed a petition opposing construction of the MetroPCS facility at the Geary site. Consistent with applicable local zoning procedures, the Board of Supervisors held a public hearing to consider the appeal on June 17, 2002. At the hearing, a number of community members (including Mr. Blum and his son) voiced disapproval of MetroPCS's CUP application. Local residents asserted, *inter alia*, that the antenna facility was not necessary for MetroPCS or the community since the Richmond District already enjoys excellent wireless service, that the facility would create a visual blight detrimental to the neighborhood character and that the facility would produce harmful RF emissions hazardous to public health.

Representatives of MetroPCS — including company managers and technical staff — appeared before the Board to speak in favor of the proposed facility, claiming that the antenna installation is necessary for MetroPCS's service coverage of the Richmond District and that it is an unobtrusive facility that will not constitute a visual or industrial blight on the neighborhood. At the conclusion of the hearing, the Board of Supervisors unanimously voted to overturn the decision of the Planning Commission and to deny MetroPCS the CUP.

The Board's findings were later formally adopted in a five-page written decision disseminated on June 24, 2002.

In articulating the bases for its decision, the Board's written opinion formally found that (1) the proposed facility is not necessary to MetroPCS's ability to service the Richmond District around the Geary site, (2) the facility is not necessary for the community, since there is already adequate wireless service in the neighborhood around the Geary site, (3) the proposed facility would constitute a "visual and industrial blight" and would be detrimental to the character of the neighborhood and (4) the proposed antenna facility is not in conformity with and would not further the policies of the City's General Plan. The Board's decision asserted that its denial of the CUP application did not reflect unreasonable discrimination against MetroPCS, did not limit or prohibit access to wireless services and did not limit or prohibit the filling of a significant gap in MetroPCS's service coverage. The Board also maintained that the proposed facility was not the least intrusive way to provide wireless services in the Richmond District.

On July 17, 2002, MetroPCS filed a complaint in the District Court for the Northern District of California claiming that, in denying its application for a CUP, the City (via the Board) had violated several provisions of § 332(c)(7) of the TCA. Both MetroPCS and the City moved for summary judgment on all claims, and on April 25, 2003, the district court issued a decision granting in part and denying in part the City's motion for summary judgment, and denying in part MetroPCS's motion for summary judgment. *MetroPCS, Inc. v. City & County of San Francisco*, 259 F. Supp. 2d 1004 (N.D. Cal. 2003).

Specifically, the district court held that (1) the Board's written denial of MetroPCS's CUP application constituted a decision "in writing" as required by § 332(c)(7) of the TCA, (2) the Board's decision was supported by "substantial evidence," (3) the Board did not unreasonably discriminate

among providers of functionally equivalent services and (4) the Board's decision was not impermissibly based on concerns over RF emissions. The City was granted summary judgment with respect to its claims on each of these issues. *Id.* However, the district court also held that significant questions of material fact existed as to whether the Board's denial of MetroPCS's CUP application prohibited or had the effect of prohibiting the provision of wireless services in violation of § 332(c)(7) of the TCA. *Id.* at 1012-15. Accordingly, the district court denied both parties' motions for summary judgment as to this issue. *Id.* at 1015. Both parties were granted leave to appeal the district court's ruling to this Court, and both parties now seek summary judgment on all claims.

## II. *JURISDICTION AND STANDARD OF REVIEW*

Since the district court granted both parties' motions to certify its order for appeal, we now have jurisdiction pursuant to 28 U.S.C. § 1292(b). We review motions for summary judgment *de novo*. *See Suzuki Motor Corp. v. Consumers Union of United States, Inc.*, 330 F.3d 1127, 1131 (9th Cir.), *cert. denied*, 124 S. Ct. 468 (2003); *King Jewelry, Inc. v. Fed. Express Corp.*, 316 F.3d 961, 963 (9th Cir. 2003). Summary judgment should be granted when "there is no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Suzuki Motor Corp.,* 330 F.3d at 1131.

To prevail on a summary judgment motion, the moving party carries the initial burden of demonstrating to the court that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has carried that burden, it then shifts to the nonmoving party, who must present evidence that there is indeed a genuine issue for trial. *See id.* at 323-24. All disputed issues of fact are to be resolved in favor of the nonmoving party. *Anderson*, 477 U.S. at 255.

## III.  *DISCUSSION*

MetroPCS advances claims under several sections of the TCA, none of which has been authoritatively construed by this circuit.[1] We address each of these claims in turn.

---

[1]The relevant provisions of the TCA read as follows:

(7)  Preservation of local zoning authority

(A)  General Authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services

. . . .

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communications] Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7).

## A. *Decision "In Writing"*

**[1]** Under the Telecommunications Act, "[a]ny decision by a State or local government . . . to deny a request to place, construct, or modify personal wireless service facilities shall be in writing." 47 U.S.C. § 332(c)(7)(B)(iii). In the proceedings below, the district court ruled that the Board's decision was adequately "in writing" under the TCA and granted the City's motion for summary judgment on this issue. 259 F. Supp. 2d at 1009. MetroPCS now appeals this ruling and moves for summary judgment.

The TCA's simple directive that all local zoning decisions adverse to wireless service providers be "in writing" seems clear enough, and the City's five-page written decision overturning the grant of MetroPCS's CUP certainly qualifies as "in writing" under any colloquial or common-sense understanding of that term. (*See* Board Decision, ER 12, Exh. 5.) However, while the plain meaning of the TCA's text supports the district court's ruling, the circuits are split in their interpretations of the "in writing" requirement, and this Circuit has yet to take an authoritative position on the issue. *See New Par v. City of Saginaw*, 301 F.3d 390, 395 (6th Cir. 2002) (noting the split and outlining the various interpretations); *S.W. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 59 (1st Cir. 2001) (giving a summary of the different interpretations).

At one interpretive extreme, some courts have required that local governments explicate the reasons for their decision and link their conclusions to specific evidence in the written record. *See, e.g., Omnipoint Communications, Inc. v. Planning & Zoning Comm'n*, 83 F. Supp. 2d 306, 309 (D. Conn. 2000) ("A local zoning authority must issue a decision in writing setting forth the reasons for the decision and linking its conclusions to evidence in the record.") (citations omitted); *Cellco P'ship v. Town Plan & Zoning Comm'n,* 3 F. Supp. 2d 178, 184 (D. Conn. 1998) (similar standard); *Ill. RSA No. 3, Inc. v. County of Peoria,* 963 F. Supp. 732, 743 (C.D. Ill.

1997) (same). The rationale for this approach is that anything short of this standard " 'places the burden on [the] Court to wade through the record below' " in order to determine the decision's reasoning and assess its evidentiary support. *Omnipoint*, 83 F. Supp. 2d at 309 (quoting *Smart SMR of N.Y., Inc. v. Zoning Comm'n*, 995 F. Supp. 52, 57 (D. Conn. 1998)).

At the other end of the spectrum lies the Fourth Circuit, which has applied a strict textualist approach to hold that merely stamping the word "DENIED" on a zoning permit application is sufficient to meet the TCA's "in writing" requirement. *AT & T Wireless PCS, Inc. v. City Council*, 155 F.3d 423, 429 (4th Cir. 1998); *see also AT & T Wireless PCS v. Winston-Salem Zoning Bd. Of Adjustment*, 172 F.3d 307, 312-13 (4th Cir. 1999). According to the Fourth Circuit, the bare language of the TCA requires nothing more, and so adhering to a more stringent standard would involve "importing additional language into the statute." *AT & T Wireless*, 155 F.3d at 429.

**[2]** The First and Sixth Circuits have charted a middle course, requiring local governments to "issue a written denial separate from the written record" which "contain[s] a sufficient explanation of the reasons for the . . . denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons." *Todd*, 244 F.3d at 60; *Saginaw*, 301 F.3d at 395-96 (adopting the *Todd* standard). This approach attempts a compromise between the demands of strict textualism and the requirements of more pragmatic policy values. The *Todd* court observed that while the statutory language of the TCA does not explicitly require detailed findings of fact or conclusions of law, and while local zoning boards are often staffed with laypersons ill-equipped to draft complex legal decisions, written decisions must be robust enough to facilitate meaningful judicial review. *See Todd*, 244 F.3d at 59-60.

In the proceeding below, the district court ultimately chose to apply the *Todd* standard and held that the Board's written

denial of MetroPCS's CUP application was adequate as a decision "in writing" under this standard. 259 F. Supp. 2d at 1009. The district court asserted that the *Todd* standard best "reconciles both the statutory language and Congressional intent of the 'in writing' requirement" and held that, in accordance with *Todd*, the City "has issued a written denial separate from the written record . . . which summarizes the proceedings, articulates the reasons it rejected MetroPCS'[s] application, and provides sufficient information for judicial review in conjunction with the written record." *Id.*

We agree with the district court that the *Todd* standard ultimately strikes the most reasonable balance between the text of the Act and the practical demands of meaningful judicial review. While the bare language of the Act may not require more than the briefest written disposition, it also does not compel a strictly minimalist construction, and the purposes of the "in writing" requirement would be ill-served by allowing local zoning authorities to issue the kind of opaque, unelaborated ruling approved by the Fourth Circuit in *AT & T Wireless v. City Council*. Indeed such a minimalist approach is in direct tension with the Act's requirement — discussed more fully in the next section — that all local zoning decisions be supported by substantial evidence contained in a written record. 47 U.S.C. § 332(c)(7)(B)(iii). If such an evidentiary review is to be undertaken at all, courts must at least be able to ascertain the basis of the zoning decision at issue; only then can they accurately assess the evidentiary support it finds in the written record. Therefore, the zoning decision must be sufficiently elaborated to permit this assessment.

**[3]** Similarly, the text of the TCA does not compel the more demanding standard outlined in *Omnipoint*, 83 F. Supp. 2d at 309, and we find persuasive the *Todd* court's observation that such a standard might place an unduly heavy burden on lay zoning boards. As a general matter, we see no reason to insist upon a standard more exacting than is required to facilitate meaningful judicial review. We therefore adopt the *Todd* stan-

dard and hold that the TCA requires local zoning authorities to issue a written decision separate from the written record which contains sufficient explanation of the reasons for the decision to allow a reviewing court to evaluate the evidence in the record supporting those reasons.

**[4]** As to the merits of the case at bar, we are persuaded that the district court did not err in granting the City's motion for summary judgment as to this claim under the *Todd* standard. As the district court correctly noted, the Board of Supervisors issued a five-page written decision, separate from the record, which summarized the facts of the dispute, recounted the proceedings it conducted, articulated its reasons for overturning the Commission's grant of the CUP and explained the evidentiary basis for its ruling. Whatever else might be said about the decision or its reasoning, it does contain sufficient explanation to enable judicial evaluation of the evidentiary support for its rationale. In fact MetroPCS itself devotes many pages of its brief to discussing and critiquing the decision's reasoning and evidentiary support.[2]

**[5]** In light of all these considerations, we affirm the district court's ruling that the Board's decision was properly "in writing" under § 332(c)(7)(B)(iii) of the TCA.

---

[2]Incidentally, we believe that the Board's decision would arguably pass muster under any of the aforementioned legal standards. It easily passes the Fourth Circuit's test, under which merely stamping the application "DENIED" is sufficient. *AT & T Wireless*, 155 F.3d at 429. And with regard to the more stringent test outlined in *Omnipoint* and its ilk, the Board's decision "[sets] forth the reasons for the decision" and does at least a passable job of "linking its conclusions to evidence in the record." *Omnipoint*, 83 F. Supp. 2d at 309. While the Board's decision is phrased in somewhat general terms, it does make reference to "the record," recounts the testimony offered during its hearing on the issue, articulates its findings and discusses its objections to many of the specific findings of the Planning Commission. Thus although the decision does not offer formal findings of fact and conclusions of law as a full-blown judicial decision might, it is not clear that the *Omnipoint* standard demands such rigor.

### B.   *Substantial Evidence*

**[6]** In addition to requiring that all local zoning decisions be "in writing," the TCA also mandates that these decisions be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). In the proceedings below, the district court granted the City's motion for summary judgment on this issue, ruling that the Board's determination that the proposed facility is not necessary for the community was supported by substantial evidence. 259 F. Supp. 2d at 1011.

In stark contrast to virtually every other aspect of this case, there appears to be universal agreement among the circuits as to the substantive content of this requirement. While the term "substantial evidence" is not statutorily defined in the Act, the legislative history of the TCA explicitly states, and courts have accordingly held, that this language is meant to trigger "the traditional standard used for judicial review of agency decisions." H.R. Conf. Rep. No. 104-458, at 208 (1996); *see also Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (holding that "substantial evidence" implies this traditional standard); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1218 (11th Cir. 2002) (same).

**[7]** However, the substantial evidence inquiry does not require incorporation of the substantive federal standards imposed by the TCA, but instead requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*. As our sister circuits have recognized, the TCA "does not affect or encroach upon the *substantive* standards to be applied under established principles of state and local law." *Oyster Bay,* 166 F.3d at 494 (internal quotation marks omitted) (emphasis added). " 'Substantial evidence' review under the TCA does not create a substantive federal limitation upon local land use regulatory power . . . ." *Todd*, 244 F.3d at 58 (citations omitted); *see also Voicestream Minneapolis, Inc. v.*

*St. Croix County*, 342 F.3d 818, 830 (7th Cir. 2003) (same rule) (citing *Todd*). In other words, we must take applicable state and local regulations as we find them and evaluate the City decision's evidentiary support (or lack thereof) relative to those regulations. If the decision fails that test it, of course, is invalid even before the application of the TCA's federal standards.

This approach serves several purposes. First, it enables us to avoid unnecessarily reaching the federal questions of whether a zoning decision violates the substantive provisions of the TCA. If a zoning board's decision, reached under its own rules, is not supported by substantial evidence, then we need not consider the application of the anti-prohibition or anti-discrimination prongs of the statute. Second, local regulations standing alone may offer little insight into whether they violate the substantive requirements of the TCA. Zoning rules — such as those that allow local authorities to reject an application based on "necessity" — may not suggest on their face that they will lead to discrimination between providers or have the effect of prohibiting wireless services. Thus, in most cases, only when a locality applies the regulation to a particular permit application and reaches a decision — which it supports with substantial evidence — can a court determine whether the TCA has been violated.

The dissent disagrees with this approach, arguing that any zoning regulation — or application of such a regulation — based on considerations of community "necessity" by its terms discriminates against new providers, cannot be squared with the TCA's anti-discrimination provision, 47 U.S.C. § 332(c)(7)(B)(i)(II), and is therefore, *ipso facto*, not supported by substantial evidence. Yet such an interpretation may thwart congressional intent concerning the independence accorded local zoning authorities under the TCA. As the dissent recognizes, the only direct *substantive* restriction the Act places on local zoning authorities is the proscription of decisions based on concerns over radio frequency emissions con-

tained in § 332(c)(7)(B)(iv). (*See* discussion of this provision, *infra* in Section III-F.) Had Congress desired to proscribe zoning decisions based on community necessity — or, for that matter, any other disfavored rationale — we are confident that it could have done so. Yet as the foregoing legal precedents and legislative history demonstrate, Congress instead intended that the traditional substantive prerogatives of local zoning authorities not be disturbed.

Perhaps more fundamentally, the dissent's conflation of the TCA's substantive anti-discrimination provision, 47 U.S.C. § 332(c)(7)(B)(i)(II), with its procedural "substantial evidence" requirement threatens to render the "substantial evidence" provision superfluous. Rather than review a zoning decision for basic evidentiary support, the dissent would require, as a threshold matter, that we review the decision for discriminatory *rationale*. But regardless of the rationale employed, zoning decisions must still satisfy the TCA's anti-discrimination provision, *id.*, which prohibits *actual* discrimination. If similarly situated providers are not treated differently *in fact*, there is little reason to obviate a zoning decision based purely on an impermissible "necessity" rationale.

**[8]** Having thus delimited the scope of our substantial evidence inquiry, we may now turn to the merits of the question before us. The most authoritative and oft-cited elaboration of the TCA's substantial evidence standard comes from the Second Circuit in *Oyster Bay*, where the court explained that "substantial evidence" implies "less than a preponderance, but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " 166 F.3d at 494 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). This formulation has been adopted by every circuit that has had occasion to consider the issue. *See, e.g., St. Croix County*, 342 F.3d at 830 (7th Cir. 2003); *United States Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow*, 340 F.3d 1122, 1133 (10th Cir. 2003); *Troup County*, 296 F.3d at 1218

(11th Cir.); *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 627-28 (1st Cir. 2002); *360° Communications Co. of Charlottesville v. Bd. of Supervisors*, 211 F.3d 79, 83 (4th Cir. 2000).

Review under this standard is essentially "deferential," such that courts may "neither engage in [their] own fact-finding nor supplant the Town Board's reasonable determinations." *Oyster Bay,* 166 F.3d at 494. In applying this standard to the facts of a given case, the written record must be viewed in its entirety, including all evidence supporting both parties, and "local and state zoning laws govern the weight to be given the evidence." *Id.* As mentioned earlier, these baseline rules are solidly established, and the parties here do not dispute them.

The upshot is simple: this Court may not overturn the Board's decision on "substantial evidence" grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence (i.e., more than a "scintilla" but not necessarily a preponderance). In the proceeding below, the district court correctly identified the prevailing legal standard discussed above, 259 F. Supp. 2d at 1009, and granted the City's motion for summary judgment on this issue, ruling that the City's determination that the Richmond District community did not need the MetroPCS antenna was (1) authorized by local zoning regulations and (2) supported by substantial evidence, *id.* at 1010-11. This ruling was legally correct.

**[9]** First, the San Francisco Planning Code explicitly authorizes the consideration of community need in evaluating conditional use permit applications. San Francisco Planning Code § 303(c)(1) (directing the City Planning Commission to consider whether "the proposed use . . . is *necessary or desirable for, and compatible with, the neighborhood or the community*") (emphasis added). Thus, the necessity-based portion of the Board's decision was clearly authorized by local zoning

regulations. Even MetroPCS acknowledges this much. Accordingly, the only remaining issue concerns whether the Board's "necessity" conclusion was supported by substantial evidence.[3] A perusal of the record demonstrates that it was.

The Board's inquiry into this issue was not a model of thoroughness or rigor,[4] but the record does clearly establish that the Richmond District is amply served by at least five other major wireless service providers and thus did not "need" the proposed Geary facility. One of MetroPCS's own representatives testified before the Board that "every carrier in San Francisco has coverage along Geary [Boulevard]," and reiterated that "every carrier has an antenna in this neighborhood." Another MetroPCS representative testified that "we've got Verizon, Sprint, AT & T, Singular [sic], Nextel, all in the very same vicinity [of the Geary site]," adding later that Sprint and Verizon "have great coverage. They have an excellent foothold in the [Geary] area." Indeed MetroPCS argued before the Board that it needed a facility at the Geary site *precisely* because it had to compete with other providers who had coverage in the area.

---

[3]MetroPCS cites *Nextel Communications of Mid-Atlantic, Inc. v. Town of Wayland*, 231 F. Supp. 2d 396, 406-07 (D. Mass. 2002), for the proposition that local zoning regulations are not protected to the extent that they violate the TCA. This assertion reflects a misreading of *Wayland*. The passage cited by MetroPCS actually speaks to the anti-prohibition prong of the TCA. While the TCA is apparently agnostic as to the substantive content of local zoning ordinances, zoning *decisions* may be invalidated if they unreasonably discriminate among providers or prohibit the provision of wireless services. *See* discussion of the prohibition and discrimination issues, *infra*.

[4]Particularly alarming is the general lack of reference to the City Planning Commission's decision to *grant* MetroPCS the CUP initially. At the least, one certainly wonders why the Planning Commission concluded, contrary to the Board's decision, that the MetroPCS site *was* "necessary and desirable" for the community. Unfortunately the Board did not shed any light on this issue, and, since at least one of its findings is supported by substantial evidence, the TCA provides no basis for remedying such procedural shortcomings. As discussed above, congressional intent to preserve local zoning authority — however constituted — is clear.

These statements by MetroPCS were buttressed by testimony and numerous written petitions from local residents, including Robert Blum (the resident actually challenging the CUP grant), reporting that the Richmond District already enjoyed excellent wireless coverage. The record also contains a site map showing the locations of SprintPCS facilities in the Richmond District, including one antenna installation just 0.2 miles from the proposed Geary site. Taken in its totality, this evidence, including unequivocal statements by MetroPCS itself, constitutes at least a showing that "a reasonable mind might accept" as adequate. The "substantial evidence" provision of the TCA requires nothing more.

[10] In briefing this issue, both parties spend considerable time discussing the evidence supporting the Board's findings on neighborhood character and the aesthetic impact of the proposed facility. MetroPCS in particular spends considerable time arguing that residents' aesthetic concerns are speculative or unsubstantiated. This may be true. Yet, since the Board's finding on community necessity was authorized by local regulations and supported by substantial evidence, it is unnecessary to consider the evidence supporting other potential grounds for the City's decision. *See e.g., Oyster Bay*, 166 F.3d at 495 (stating that the court must "determine whether the Board possessed substantial evidence on one or both of [its permissible] grounds" for a zoning permit denial). The district court was correct in taking this analytical approach as well, relegating these ancillary concerns to a footnote. 259 F. Supp. 2d at 1011 n.6.

[11] As the district court below identified the correct prevailing legal standard and applied it properly, we affirm the district court's ruling that the Board's decision was supported by "substantial evidence" as required by the TCA.

## C. *Discrimination Claim*

[12] In addition to its more concrete procedural requirements, the TCA also mandates that "[t]he regulation of the

placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof — (I) *shall not unreasonably discriminate among providers of functionally equivalent services.*" 47 U.S.C. § 332(c)(7)(B)(i)(I) (emphasis added). As the bulk of the cases on this issue have recognized, by using this language "the Act explicitly contemplates that some discrimination 'among providers of functionally equivalent services' is allowed. Any discrimination need only be reasonable." *AT & T Wireless,* 155 F.3d at 427; *see also Omnipoint Communications Enters., L.P. v. Zoning Hearing Bd.,* 331 F.3d 386, 395 (3d Cir.) (citing *AT & T Wireless,* 155 F.3d at 427), *cert. denied*, 124 S. Ct. 1070 (2003); *Nextel W. Corp. v. Unity Township*, 282 F.3d 257, 267 (3d Cir. 2002) (same); *Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 638 (2d Cir. 1999) (same).

More specifically, most courts have held that discrimination based on "traditional bases of zoning regulation" such as "preserving the character of the neighborhood and avoiding aesthetic blight" are reasonable and thus permissible. *AT & T Wireless*, 155 F.3d at 427; *see also Willoth*, 176 F.3d at 639 (same) (citing *AT & T Wireless*). Aside from reflecting the plain meaning of the TCA's text, this interpretation is also supported by the Act's legislative history. The House Conference Report on the TCA explained the Act's nondiscrimination clause as follows:

> The conferees also intend that the phrase "unreasonably discriminate among providers of functionally equivalent services" will *provide localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services*. For example, the conferees do not intend that if a State or local government grants a permit in a commercial district, it must also

grant a permit for a competitor's 50-foot tower in a residential district.

H.R. Conf. Rep. No. 104-458, at 208 (1996) (emphasis added).[5]

In keeping with these baseline principles, almost all federal courts considering such cases have ruled that providers alleging unreasonable discrimination must show that they have been treated differently from other providers whose facilities are "*similarly situated*" in terms of the "*structure, placement or cumulative impact*" as the facilities in question. *APT Pittsburgh Ltd. P'ship v. Penn Township Butler County*, 196 F.3d 469, 480 n.8 (3d Cir. 1999) (internal quotation marks omitted) (emphasis added); *Willoth*, 176 F.3d at 643 ("[I]t is not unreasonably discriminatory to deny a subsequent application for a cell site that is substantially more intrusive than existing cell sites by virtue of its structure, placement or cumulative impact."); *see also Omnipoint*, 331 F.3d at 395 ("Permitting the erection of a communications tower in a business district does not compel the [zoning board] to permit a similar tower at a later date in a residential district."); *Unity Township*, 282 F.3d at 267 (discrimination claim " 'require[s] a showing that the other provider is similarly situated' ") (quoting *Penn Township,* 196 F.3d at 480 n.8). In fact, the sole district court case from the Ninth Circuit on this issue holds that a mere increase in the number of wireless antennas in a given area over time can justify differential treatment of providers. *Airtouch Cellular v. City of El Cajon*, 83 F. Supp. 2d 1158, 1166 (S.D. Cal. 2000).

---

[5]Indeed one of the primary purposes of section 332(c)(7) is to protect the legitimate traditional zoning prerogatives of local governments. This section of the Act is actually entitled "Preservation of local zoning authority" and states as its baseline principle that, "[e]xcept as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government . . . over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A).

In ruling that the City's decision here did not unreasonably discriminate against MetroPCS, the district court employed a somewhat confusing and contradictory analysis. The court first stated that, in order to prevail, MetroPCS must demonstrate that the City treated it differently from one of its competitors for a "functionally *identical* request." 259 F. Supp. 2d at 1012 (emphasis added). The district court cites *Sprint Spectrum*, 244 F. Supp. 2d at 117, for this proposition, though the court's formulation appears to reflect a misreading of that case. The court in *Sprint Spectrum* actually applied the broader legal principle that "a local board may reasonably consider the location of the cell tower when deciding . . . whether to approve the application for construction." *Id.*

Later in its opinion, the district court stated that MetroPCS must demonstrate that "other providers have been permitted to build *similar* structures on *similar* sites while it has been denied." 259 F. Supp. 2d at 1012 (emphasis added). As discussed above, given that the wireless providers in question provide "functionally equivalent services" (which is undisputed in this case), "similarly situated" is the prevailing legal standard on the discrimination issue. The district court then proceeded to find that the facilities of other service providers in the Richmond District are "differently situated from MetroPCS because they have sought to place their antenna structures at different locations within the district." *Id.* Thus while it is not clear whether the decision below ultimately turned on the prevailing "similarly situated" analysis (similar structures on similar sites) or the district court's own "functionally identical request" standard, it appears that the court would have ruled for the City under either test. This ruling was error.

First, the district court frames the relevant legal inquiry too narrowly. For the policy reasons discussed above, the "similarly situated" standard seems to strike an appropriate balance between Congress's twin goals of promoting robust competition and preserving local zoning authority. The district court's

formulation of the discrimination inquiry, under which localities may deny use permits any time the relevant antenna structures are at "different locations," *id.*, appears unduly narrow. Unless competing providers seek to place virtually identical antennas at the very same location or on the same specific structure, no wireless service provider could ever carry its burden to show discrimination under this test. Such a standard would give localities far too much leeway in rejecting functionally *similar* requests by competing providers and would thwart the competition that the TCA sought to facilitate.

**[13]** As for the district court's final determination that the City did not, as a matter of law, unreasonably discriminate against MetroPCS, this too was error. The factual record is equivocal on the discrimination issue. While the Board's decision appears to have been authorized by the City Planning Code, it is not entirely clear whether the proposed MetroPCS site is "similarly situated" to other approved facilities in the Richmond District. The record shows that there is a competing SprintPCS wireless facility, also on Geary Boulevard, just two blocks (~0.2 miles) from the rejected MetroPCS site. MetroPCS also alleges that, shortly after it denied MetroPCS's application for a CUP at the Geary site, the Board approved the installation of a Cingular Wireless facility on a rooftop in the same neighborhood. These facts at least suggest a real possibility of discrimination between *similar* sites.

While the Board maintains that the other existing wireless facilities in the Richmond District were approved because they were placed at a more ideal location, *see* 259 F. Supp. 2d at 1012, the record contains no systematic comparison of the sites in question. Similarly, while the record also contains photo simulations of the proposed MetroPCS site, (ER 31 Exh. 1), there are no similar photographs of competing facilities in the area. In short, while it is undisputed that there are other wireless facilities in the same neighborhood, there appears to have been no detailed inquiry into the similarity of these existing facilities to the proposed MetroPCS facility in

terms of "structure, placement or cumulative impact." *See again Penn Township*, 196 F.3d at 480 n.8 (internal quotation marks omitted).

**[14]** Given the foregoing, MetroPCS has presented sufficient evidence to create an issue of fact as to the discrimination claim. Since there is no conclusive evidence as to how MetroPCS's proposed facility compares to the existing sites of its competitors in terms of "structure, placement or cumulative impact," substantial questions of fact remain as to whether the Board of Supervisors unreasonably discriminated against MetroPCS, and thus neither party is entitled to judgment as a matter of law.[6] We accordingly reverse the district court's grant of summary judgment in favor of the City on

---

[6]In its brief, MetroPCS asserts that the City's community necessity rationale "constitutes unreasonable discrimination against new providers and is antithetical to the pro-competitive goals of Section 332(c)(7)(B)." In support of this argument, MetroPCS relies on *Western PCS II Corp. v. Extraterritorial Zoning Authority*, 957 F. Supp. 1230, 1237-38 (D.N.M. 1997), and *Sprint Spectrum*, *L.P v. Town of Easton*, 982 F. Supp. 47, 51 (D. Mass. 1997), both of which ruled that local governments may not deny wireless providers permission to construct facilities merely because they believe that existing wireless service is adequate. However, as the district court notes in its opinion below, 259 F. Supp. 2d at 1012 n.8, both of these decisions turned on the local government's disregard of relevant evidence and improper application of relevant zoning laws. And while the City does little to directly address MetroPCS's broader argument that necessity-based zoning decisions are inherently discriminatory against new market entrants, such an argument is of limited persuasiveness.

As discussed above, the Act specifically preserves traditionally local zoning authority over siting decisions, and it has been consistently held that the TCA does not intrude upon the substantive content of local zoning rules. *Oyster Bay,* 166 F.3d at 494. In other words, far from prohibiting zoning decisions based on redundancy or community "necessity," the TCA itself appears to be totally agnostic on this issue. Moreover, a purely aesthetic determination that a certain neighborhood is blighted with too many wireless antennas — which is specifically permitted in the prevailing case law and anticipated in the legislative history of the TCA — may similarly disadvantage new market entrants who wish to add new facilities in the neighborhood.

this issue and remand the case for further proceedings to determine whether the proposed MetroPCS facility was similarly situated to competing facilities approved by the City and, if so, whether the City discriminated against MetroPCS with respect to the proposed and the competing facilities.

### D. *Prohibition Claim*

[15] Section 332 of the TCA provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or any instrumentality thereof — (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). MetroPCS alleges that, in denying its application for a CUP, the City has violated this provision by both imposing a "general ban" on new service providers in the Richmond District and effectively prohibiting the provision of wireless services by preventing MetroPCS from filling a "significant gap" in its coverage.

In the proceedings below, the district court held that the City's decision did not amount to a "general ban" on wireless services, but that material questions of fact remain as to

---

As for the case at bar, the claim of discrimination against new providers also rings a bit hollow coming from MetroPCS, since the record shows that it has been allowed to construct some 30 sites in the city of San Francisco, including 18 facilities under discretionary CUPs. While this does not necessarily establish that MetroPCS has been allowed to realize seamless coverage in the city, it certainly does refute any claim of discrimination against new providers *as such*.

More to the point, Congress has already considered the competing interests of local zoning authorities and wireless providers (both new and old), and has constructed a statutory scheme to accommodate *both*. As will be discussed more fully below, while the TCA is agnostic as to the substantive *content* of local regulations, localities are nonetheless constrained by section 332(c)(7)(B)(i)(I) and (II) of the TCA, which preclude them from unreasonably discriminating against competing providers or (effectively) prohibiting the provision of wireless services. *See* discussion *infra* at Section III, Part E.

whether the denial of MetroPCS's CUP application perpetuates a "significant gap" in MetroPCS's coverage. 259 F. Supp. 2d at 1015. We find the district court's reasoning persuasive, and we affirm all aspects of its holding as to this claim.

### 1.  General Ban

A city-wide general ban on wireless services would certainly constitute an impermissible prohibition of wireless services under the TCA. In fact, this is the only circumstance under which the Fourth Circuit will find an impermissible prohibition under the statute. *See AT & T Wireless*, 155 F.3d at 428 (holding that only "blanket prohibitions" and "general bans or policies" affecting *all* wireless providers count as effective prohibition of wireless services under the TCA). Under this rule, which is based on a strict plain meaning analysis, individual zoning decisions or persistent coverage gaps can never constitute a prohibition under the statute — courts must ask only whether local governments have (effectively) banned wireless services *altogether*. *Id.* The City asks us to adopt the Fourth Circuit's interpretation as well, noting that the House Conference Committee's Report on the TCA seems to anticipate a narrow, bare-bones approach: "It is the intent of this section that bans or policies that have the effect of banning personal wireless services or facilities not be allowed and that decisions be made on a case-by-case basis." H.R. Conf. Rep. No. 104-458, at 208 (1996).

However, for a variety of reasons, we decline to adopt the Fourth Circuit rule on this point. The language of the TCA, while sparse, does not dictate such a narrow interpretation even under a plain meaning approach. As the First Circuit has observed, given the current structure of the wireless services market, "[t]he fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers." *Second Generation Prop*s.*, 313 F.3d at 634. Additionally the Fourth Circuit's interpretation, by permitting all but the most restric-

tive local zoning policies, could actually thwart Congress's twin goals of encouraging competition in the wireless services industry and facilitating efficient use of bandwidth. The touchstone of our prohibition analysis is therefore not limited to blanket bans or general policies prohibiting wireless services. The TCA framework requires a more discriminating inquiry. (*See* our discussion of the "Significant Gap" analysis, *infra*.)

Turning briefly to the merits, the record offers no support for MetroPCS's assertion that the City has imposed a "general ban" on wireless services, against new providers or anyone else. Aside from the fact that it would be extremely dubious to infer a general ban from a single CUP denial, the record reveals that the City has been receptive to wireless providers in general and MetroPCS in particular. It is undisputed that the City has authorized the installation of some 2,000 antennas at about 450 sites around the city, including 30 MetroPCS sites. This undercuts any assertion that the City has placed a general ban on new market entrants. The district court made virtually identical observations in its own finding that no general ban exists, 259 F. Supp. 2d at 1013, and we uphold this ruling as entirely correct.

## 2. *Service Gap*

Several circuits have held that, even in the absence of a "general ban" on wireless services, a locality can run afoul of the TCA's "effective prohibition" clause if it prevents a wireless provider from closing a "significant gap" in service coverage. This inquiry generally involves a two-pronged analysis requiring (1) the showing of a "significant gap" in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations. Currently there is a clear circuit split as to what constitutes a "significant gap" in coverage, and the Ninth Circuit has yet to rule on the issue.[7]

---

[7]The high stakes involved for both wireless service providers and local governments are reflected in the fact that most of the Amicus briefs filed in this case focus on this issue.

### (a)    Definition of "Significant Gap"

The test employed by the Second and Third Circuits holds that a "significant gap" in service exists only if *no provider* is able to serve the "gap" area in question. *See Omnipoint*, 331 F.3d at 398; *Unity Township*, 282 F.3d at 265; *Penn Township,* 196 F.3d at 478-80; *Willoth*, 176 F.3d at 643. One district court in the Ninth Circuit has also adopted this test. *El Cajon*, 83 F. Supp. 2d at 1167. This test is sometimes referred to as the "one provider" rule since, if any single provider offers coverage in a given area, localities may preclude other providers from entering the area (as long as the preclusion is a valid, nondiscriminatory zoning decision that satisfies the other provisions of the TCA).

This rule has been touted as proceeding from the consumer's perspective rather than the individual service provider's perspective, which the Third Circuit argues is more in keeping with the regulatory goals of the TCA — as long as *some* provider offers service in the area, consumers will be adequately served and the TCA's goal of establishing nationwide wireless service will be achieved. *See Omnipoint*, 331 F.3d at 397-98; *Unity Township*, 282 F.3d at 265. Under this view, the TCA protects only the individual user's ability to receive service from one provider or another; it does not protect each service provider's ability to maintain full coverage within a given market. *Omnipoint*, 331 F.3d at 397-98; *Unity Township*, 282 F.3d at 265; *cf. Willoth*, 176 F.3d at 641-43.

[16] The First Circuit has recently rejected the "one provider" approach and held that a local regulation creates a "significant gap" in service (and thus effectively prohibits wireless services) if the *provider in question* is prevented from filling a significant gap *in its own* service network. *See Second Generation Props.,* 313 F.3d at 631-33. This approach formally takes the perspective of the individual service provider in assessing coverage gaps, but, as the *Second Generation Properties* court persuasively explains, this approach actually bet-

ter serves both individual consumers and the policy goals of the TCA.[8] The *Second Generation Properties* court notes that the TCA "aims to secure lower prices and better service for consumers by opening all telecommunications markets to competition." *Id.* at 631 (citing H.R. Conf. Rep. No. 104-458, at 113 (1996)). The court then warns against the dysfunctional implications of the Second and Third Circuits' "one provider rule":

> A flat "any service equals no effective prohibition" rule would say that a town could refuse permits to build the towers necessary to solve any number of different coverage problems . . . . Such a rule would be highly problematic because it does not further the interests of the individual consumer. To use an example from this case, it is of little comfort to the customer who uses AT & T Wireless (or Voicestream, Verizon, Sprint, or Nextel) who cannot get service along the significant geographic gap which may exist along Route 128 that a Cingular Wireless customer does get some service in that gap . . . . *The result [of such a rule] would be a crazy patchwork quilt of intermittent coverage. That quilt might have the effect of driving the industry toward a single carrier.* When Congress enacted legislation to promote the construction of a nationwide cellular network, such a consequence was not, we think, the intended result.

*Id.* at 633 (footnote omitted). In short, the First Circuit's multiple provider rule better facilitates the robust competition

---

[8] It should be noted that there is a difference between the interests of local residents — who may prefer fewer providers to limit the number of antennas in the area — and those of wireless service subscribers who may be frustrated that their particular provider cannot offer coverage in a given neighborhood. Both of these may be categorized as the "consumer perspective," though they lead to different results. Our use of the term "consumer" in the discussion here refers to wireless service subscribers.

which Congress sought to encourage with the TCA, and it better accommodates the current state of the wireless services market. The district court also found these arguments persuasive, since it formally adopted the First Circuit rule in its decision below. 259 F. Supp. 2d at 1013-14.

For its part, MetroPCS does not object to the district court's adoption of the First Circuit "multiple provider rule" (in fact MetroPCS and its Amici argue strenuously in favor of the First Circuit's approach), though it argues that the City's zoning "criteria," which allow for CUP denials based on findings that a given facility is "not necessary" for the community, are "impossible for any non-incumbent carrier to meet" and thus constitute an effective prohibition of wireless services. Once again, the large number of permits already granted by the City — to providers new and old — belies this assertion.

Additionally, we emphasize that MetroPCS's concerns regarding zoning decisions based on "necessity" can be accommodated by the First Circuit's version of the significant gap test. Under this rule, zoning decisions explicitly based on redundancy of service are not per se invalid, but they are subject to the crucial limitations that (1) they cannot discriminate between similarly situated facilities and (2) they cannot result in a significant gap in service for the *provider in question*. As will be discussed shortly, the First Circuit's interpretation also fully meets the preemption and supremacy arguments advanced by MetroPCS.[9]

[17] Having considered both the avowed policy goals of the TCA and the practical implications of the various constructional options, we elect to follow the district court's lead and formally adopt the First Circuit's rule that a significant gap in service (and thus an effective prohibition of service) exists whenever a provider is prevented from filling a significant

---

[9]*See* discussion of MetroPCS's supremacy and preemption arguments, *infra* at Section III, Part E.

gap in *its own* service coverage. With the correct legal standard thus clarified, we now turn to the merits of MetroPCS's prohibition claim.

In applying the First Circuit's provider-focused notion of "significant gap," the district court denied both parties summary judgment, holding that significant questions of fact still exist as to whether the Board's decision actually perpetuates a significant gap in MetroPCS's coverage. This conclusion is amply supported by the existing record and, therefore, we affirm the district court's ruling on this issue. Both parties confidently assert that the current record unequivocally supports their respective positions. But to the contrary, the record is replete with contradictory allegations as to MetroPCS's need for the Geary site. *Compare* Statements of Suki McCoy, SER at 223-36 (stating that MetroPCS has adequate coverage in the Richmond District); Statements of Martin Signithaler, SER at 134-36 (stating that the Geary site would not improve MetroPCS's effective coverage); MetroPCS Marketing Materials, SER 225, 234 (advertising that MetroPCS has full coverage around the Geary site), *with* Statements of MetroPCS Technological Expert, SER at 200-02 (stating that MetroPCS coverage is not adequate without the Geary site); Declaration of Lisa Nahmanson, ER 32 (stating that MetroPCS coverage is insufficient without the Geary site); Testimony of Deborah Stein, SER 191-200(same); Declaration of John Schwartz, ER 49 (challenging basis of City's contention that existing MetroPCS service is adequate).

In urging us to grant it summary judgment on this issue, the City cites a bevy of cases that, collectively, are meant to demonstrate that "[t]he TCA does not assure every wireless carrier a right to seamless coverage in every area it serves," and that the inability to cover a "a few blocks in a large city" is, as a matter of law, not a "significant gap." While we recognize that the TCA does not guarantee wireless service providers coverage free of small "dead spots,"[10] the existing case law

---

[10]The district court correctly notes that the relevant service gap must be truly "significant" and "not merely individual 'dead spots' within a greater

amply demonstrates that "significant gap" determinations are extremely fact-specific inquiries that defy any bright-line legal rule. Moreover, the City's assertion as to the size of MetroPCS's alleged service gap merely assumes the very fact in issue here — the existence and geographic proportions of a gap in MetroPCS's coverage.

[18] Given the conflicting contents of the record, there is simply no basis for granting either party summary judgment on this issue. We affirm the district court's ruling to that effect.

### *(b)   Least Intrusive Means*

[19] Under all existing versions of the "significant gap" test, once a wireless service provider has demonstrated that the requisite significant gap in coverage exists, it must then make some showing as to the intrusiveness or necessity of its proposed means of closing that gap. Here again, the circuits are split as to the required showing.

The Second and Third Circuits require the provider to show that "the manner in which it proposes to fill the significant gap in service is the *least intrusive on the values that the denial sought to serve*." *Penn Township*, 196 F.3d at 480 (emphasis added); *see also Omnipoint*, 331 F.3d at 398; *Unity Township*, 282 F.3d at 266; *Willoth*, 176 F.3d at 643. The First and Seventh Circuits, by contrast, require a showing that there are "no alternative sites which would solve the problem." *Second Generation Props.*, 313 F.3d at 635; *see also St. Croix County*, 342 F.3d at 834-35 (adopting the First Circuit

---

service area." 259 F. Supp. 2d at 1014. Courts applying both versions of the "significant gap" test appear to agree on this proposition. *See e.g., Second Generation Props.*, 313 F.3d at 631; *360° Communications Co.*, 211 F.3d at 87; *Willoth*, 176 F.3d at 643-44.

test and requiring providers to demonstrate that there are no "viable alternatives") (citing *Second Generation Properties*).[11]

After concluding that material issues of fact remain as to the presence (or absence) of a significant gap in MetroPCS's coverage, the district court attempted to reconcile competing interpretations of the intrusiveness inquiry by creating its own "fact-based test that requires the provider to demonstrate that its proposed solution is the *most acceptable option* for the community in question." 259 F. Supp. 2d at 1015 (emphasis added).

Since there is no controlling legal authority on the issue, our choice of rule must ultimately come down to policy considerations. The district court's "most acceptable option" rubric seems a hopelessly subjective standard, and one wonders how a proposed site could ever be proven "the most acceptable" if a zoning proposal with respect to it had already been denied by local authorities. On the other hand, the First and Seventh Circuit requirement that a provider demonstrate that its proposed facility is the only viable option seems too exacting. As the case at bar demonstrates, there may be several viable means of closing a major service gap, (*see* MetroPCS Alternative Site Analysis, SER 26-35), and in such a situation, this "only viable option" rule would either preclude the construction of any facility (since no single site is the "only viable" alternative) or require providers to endure

---

[11]The district court also notes that, in the Fourth Circuit, " '[a] community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community.' " 259 F. Supp. 2d at 1014 (quoting *360° Communications Co.*, 211 F.3d at 87). This rule is inapposite to the case at bar since the Fourth Circuit, as discussed above, does not recognize either version of the "significant gap" test. Instead, it holds that the TCA prohibits only general or "blanket" bans on wireless services. Under such a rule, denials of individual siting requests can never run afoul of the TCA, and so the relative intrusiveness of different siting proposals is irrelevant.

repeated denials by local authorities until only one feasible alternative remained. This seems a poor use of time and resources for both providers and local governments alike.

[20] The Second and Third Circuit "least intrusive" standard, by contrast, allows for a meaningful comparison of alternative sites before the siting application process is needlessly repeated. It also gives providers an incentive to choose the least intrusive site in their first siting applications, and it promises to ultimately identify the best solution for the community, not merely the last one remaining after a series of application denials.

[21] For these reasons, we now adopt the "least intrusive means" standard and instruct the district court to apply this rule as necessary in its consideration of the prohibition issue on remand.

## E.  *Preemption Claim*

One additional note is in order that bears, albeit indirectly, on MetroPCS's discrimination and prohibition claims. MetroPCS vigorously asserts, as separate claims independent of the specific provisions of the TCA, that the Board's denial of its CUP based on an appraisal of community "necessity" violates the FCC's exclusive licensing authority over wireless providers and is preempted by the TCA's statutory scheme.

In support of this claim MetroPCS points out that the FCC has identified "an immediate need for cellular service" and has established the goal of "providing for up to two cellular systems per market." *In the Matter of An Inquiry Into the Use of Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems*, Memorandum Opinion and Order on Reconsideration, 89 F.C.C.2d 58, at ¶ 82 (1982). The FCC further sought to preclude state regulation of the number of service providers in a given market: "[W]e have already determined 'need' on a nationwide basis and have preempted

the states from denying state certification based on the number of existing carriers in the market or the capacity of existing carriers to handle the demand for mobile services." *Id.* Congress similarly has declared that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service," 47 U.S.C. § 332(c)(3)(A), and that the TCA is "not intended to limit or affect the Commission's general authority over radio telecommunications, including the authority to regulate the construction, modification and operation of radio facilities," H.R. Conf. Rep. No. 104-458, at 209 (1996). For its part, the City does little to address these arguments directly.

Yet while MetroPCS does convincingly demonstrate that the FCC has exclusive authority to issue licenses and regulate the wireless services market — a point which appears to be undisputed between the parties — the TCA itself fully accommodates these preemption concerns in its anti-discrimination and anti-prohibition provisions. The TCA's statutory scheme ensures that the bandwidth usage and competitive market dynamics sought by Congress and the FCC will be realized, while at the same time allowing cities to prevent certain areas from being overburdened by a proliferation of wireless facilities. MetroPCS's vigorous *per se* arguments against necessity-based zoning decisions misconstrue the delicate regulatory balance struck by the Act.

First of all, a zoning decision to prohibit construction of a wireless facility at a specific location — whether based on necessity or not — does not implicate the FCC's ability to regulate the number of wireless providers in a given market. Federal supremacy and the FCC's exclusive power to regulate wireless markets are fully vindicated in the TCA's anti-discrimination and anti-prohibition provisions, especially under the First Circuit's "multiple provider" interpretation of the "prohibition" clause. As discussed above, whatever a locality's judgment as to the need for a facility at a given site, such a determination may not effectively prohibit service or

reflect favoritism for one provider over another. This protects, at a macro-level, the competitive markets that the FCC has sought to construct. Put differently, if a single siting denial does not create significant gaps in provider coverage and reflects no unreasonable discrimination among providers, market dynamics and FCC authority are not threatened in the first place.

Essentially, the TCA represents a congressional judgment that local zoning decisions harmless to the FCC's greater regulatory scheme — and only those proven to be harmless — should be allowed to stand. As discussed earlier, the TCA "does not affect or encroach upon the *substantive* standards to be applied under established principles of state and local law," *Oyster Bay*, 166 F.3d at 494 (internal quotation marks omitted) (emphasis added), and it "does not create a substantive federal limitation upon local land use regulatory power," *Todd*, 244 F.3d at 58; *see also St. Croix County*, 342 F.3d at 830 (same rule) (quoting *Todd*). MetroPCS's preemption and supremacy claims are thus misdirected. *See, e.g., El Cajon*, 83 F. Supp. 2d at 1168-69 (rejecting a federal preemption claim in a § 332(c)(7) case). The fate of MetroPCS's real concerns in this area — that localities may be able to reject all siting proposals that they feel are unnecessary — is determined by our construction of the TCA's prohibition provision. As discussed earlier, the First Circuit's multiple-provider approach best preserves market competition and addresses these supremacy and preemption concerns as well.

## F.  *Environmental Concerns*

**[22]** The last claim in this case is easily resolved. The TCA provides that localities may not base zoning decisions on concerns over radio frequency emissions if the proposed wireless facility complies with FCC emissions requirements:

> No State or local government or instrumentality thereof may regulate the placement, construction,

and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC]'s regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(B)(iv). There is no dispute that MetroPCS's proposed facility for the Geary site complies with the relevant FCC regulations. The only issue is whether the City's decision was impermissibly based on concerns over RF emissions.

MetroPCS argues that the Board did base its decision on environmental considerations. In support of this claim it notes that "opponents of MetroPCS's application made boisterous presentations before the Board regarding RF emissions, accompanied by argument, badges and t-shirts complaining about RF emissions." MetroPCS also claims that "the Board's denial motion expressly states that it was based on 'all of the public comments made in support of and opposed to the appeal.' " Finally, MetroPCS notes that the Board's decision stated the proposed facility would "not promote the health, safety and welfare of the city."

These observations are of little relevance to the issue here. As the district court correctly points out, the party actually challenging the MetroPCS CUP application before the Board (Mr. Blum) took pains to clarify that his appeal was *not* based on environmental concerns. Additionally, the Board's formal decision against MetroPCS did *not* state that it was "based on" all public comments made in support of and opposed to the appeal. MetroPCS's quotation on this point is misleading. The Board merely stated that it "*reviewed and considered*" all such comments, which is exactly what a local zoning board is supposed to do at a public hearing. (Emphasis added.)

[23] Most crucially, the Board's written decision does not once mention RF emissions as a motivation for denying

MetroPCS's CUP application. Broadly stating (presumably as a recitation of the City's Policy Principles) that the proposed facility "will not promote" public health, safety and welfare is not remotely equivalent to basing a zoning decision on a fear of RF emissions. Given the foregoing, the one case cited by MetroPCS on this issue (*Telespectrum, Inc. v. Pub. Serv. Comm'n*, 227 F.3d 414 (6th Cir. 2000)), which involved a straightforward application of the TCA's RF provision, is inapposite. The district court was correct in granting the City summary judgment as to this claim, and we affirm that ruling.

## IV.   *CONCLUSION*

For the foregoing reasons, we AFFIRM the district court's ruling that the Board's decision was properly "in writing," supported by substantial evidence and not impermissibly based on concerns over radio frequency emissions under the TCA. We also AFFIRM the district court's ruling that material questions of fact remain as to whether the Board's decision effectively prohibited the provision of personal wireless services under the TCA. Finally, we REVERSE the district court's determination that the Board's decision did not, as a matter of law, unreasonably discriminate among providers of functionally equivalent services within the meaning of the TCA, and we REMAND this case for further proceedings consistent with this opinion.

---

GRABER, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that genuine issues of material fact remain with respect to whether the Board of Supervisors' (Board) denial of MetroPCS's application for a Conditional Use Permit (CUP) to construct wireless facilities violated the anti-discrimination and anti-prohibition provisions of the Telecommunications Act of 1996 (TCA), 47 U.S.C. §§ 151-

615. I write separately because the Board's determination that the proposed facilities are unnecessary, premised on the fact that at least one other service provider serves the same area, is irreconcilable with the anti-discrimination provision of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II). In view of that inconsistency, the Board's "necessity" finding cannot support its denial of MetroPCS's request even if substantial evidence supports that finding. I respectfully dissent from the majority's conclusion to the contrary.

According to the majority, a reviewing court's analysis of the reasons given by a zoning authority for denying a request to construct wireless facilities begins and ends with determining whether those reasons are authorized by local regulations and supported by evidence. Relying on the Second Circuit's decision in *Cellular Telephone Co. v. Town of Oyster Bay*, the majority concludes that "the TCA 'does not affect or encroach upon the *substantive* standards to be applied under established principles of state and local law.' " Maj. op. at 2722 (emphasis in majority opinion) (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)). That is, the reasons stated by a zoning authority in denying a request for wireless facilities are irrelevant under the majority's analysis. Accordingly, the majority concludes that the Board was entitled to reject MetroPCS's application for a CUP solely because "[n]othing in the record suggests that the area proximate to 5200 Geary Boulevard is not already served by at least one other wireless service provider." *See* Maj. op. at 2732-33 n.6 (finding no error in the Board's "necessity" rationale because "the TCA is agnostic as to the substantive *content* of local regulations").

The majority overstates the extent of the TCA's indifference to the substantive content of local regulations when those regulations are applied to zoning decisions regarding the "placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(B)(i). *Oyster Bay* tempered its statement regarding the TCA's neutrality by

observing that at least one provision of the TCA places a substantive limitation on the permissible bases to support a zoning authority's denial of a request for the construction of wireless facilities: "We note . . . that [47 U.S.C.] § 332(c)(7)(B)(iv)[1] bars denials based on environmental effects of rfes [radio frequency emissions,] if the applicant facility would comply with FCC standards . . . ." *Oyster Bay*, 166 F.3d at 494 n.2. Although health and safety are undeniably a proper subject for local regulation, the TCA " 'prevents the denial of a permit *on the sole basis* that the facility would cause negative environmental effects.' " *Id.* at 495 (quoting *Iowa Wireless Servs., L.P. v. City of Moline*, 29 F. Supp. 2d 915, 923 (C.D. Ill. 1998).

Similarly, "the anti-discrimination and anti-prohibition provisions of the TCA, [47 U.S.C. § 332(c)(7)(B)(i)(I), (II),] involve federal limitations on state authority." *S.W. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 58 (1st Cir. 2001) (internal quotation marks omitted). Unlike the TCA's provision relating to radio frequency emissions, the anti-discrimination and anti-prohibition provisions do not expressly prohibit the consideration of specific grounds in zoning decisions regarding the construction of wireless facilities. Nonetheless, those provisions do limit the ways in which a state or local government may apply its zoning regulations to a request for the placement of wireless facilities. As *Todd* observed, a local zoning authority is "subject to several substantive and procedural limitations that 'subject [local governments] to an outer limit' upon their ability to regulate personal wireless services land use issues." *Id.* at 57 (alteration in orig-

---

[1]47 U.S.C. § 332(c)(7)(B)(iv) provides:

No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

inal) (quoting *Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9, 15 (1st Cir. 1999)); *see also APT Pittsburgh Ltd. P'ship v. Penn Township Butler County of Pennsylvania*, 196 F.3d 469, 473 (3d Cir. 1999) (noting that the TCA "places several substantive and procedural limits upon [local zoning] authority when it is exercised in relation to personal wireless service facilities").

For example, the Board could not deny MetroPCS's application solely on the ground that the availability of wireless services in the Geary neighborhood may lead to increased wireless telephone usage among automobile drivers in that neighborhood, with a commensurate increase in traffic accidents. Traffic safety is certainly a legitimate zoning concern, and the Board could easily produce substantial evidence to support a correlation between wireless telephone usage among drivers and traffic accidents. Nonetheless, the Board's rationale for its decision would be entirely inconsistent with the TCA's anti-prohibition provision, as carefully and correctly interpreted by the majority, because the Board would be seeking to *preserve* a significant coverage gap. Accordingly, a denial of permission to construct wireless facilities for that reason alone should not survive judicial scrutiny.

The Board's necessity rationale presents the same problem. Whatever its consistency with local zoning ordinances,[2] the denial of MetroPCS's request on the ground that the Geary neighborhood is already served by at least one other wireless service provider is irreconcilable with § 332(c)(7)(B)(i)(II)'s prohibition of zoning decisions that "unreasonably discriminate among providers of functionally equivalent services." As explained in the House Conference Report, the chief purpose of the TCA is to "open[ ] all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 1 (1996). The

---

[2]Pursuant to San Francisco Planning Code § 303(c)(1), the Board may consider whether a proposed development "is necessary or desirable for, and compatible with, the neighborhood or community."

TCA's anti-discrimination provision furthers that purpose by ensuring "that a State or local government does not in making a decision regarding the placement, construction and modification of facilities of personal wireless services described in this section *unreasonably favor* one competitor over another." *Id.* at 208 (emphasis added).

Here, the Board's necessity determination results in precisely the type of unreasonable discrimination that the TCA seeks to prevent. It protects existing service providers against potential competitors and effectively bars all new market entrants from the area in question. Because the Board's necessity determination is inherently and unreasonably discriminatory, it cannot serve as a valid, legally relevant basis for rejecting MetroPCS's application for a CUP.

The majority misunderstands my point when it claims that I argue "that any zoning regulation—or application of such a regulation—based on considerations of community 'necessity' by its terms discriminates against new providers." Maj. op. at 2723. Instead, I argue much more simply, and much more narrowly, that a local agency's fact-finding about "necessity" must respect the statutorily required definition of what "necessity" is.

Neither the majority nor the district court looked further than the Board's "necessity" rationale in holding that substantial evidence supported the Board's decision as a whole. Because "[a] significant number of community members that opposed the installation indicated that they had adequate wireless services [from other providers] in their district," the district court concluded that it "need not reach the question of whether there is substantial evidence supporting the Board's determination that MetroPCS's installation would cause visual blight, or that MetroPCS did not need the antennas for its own service." *MetroPCS, Inc. v. City & County of San Francisco*, 259 F. Supp. 2d 1024, 1010-11 & n.6 (N.D. Cal 2003). For the reasons discussed above, I disagree with the

majority that the Board's decision can rest on that ground alone, even if that ground is supported by substantial evidence. Accordingly, on remand, I would instruct the district court to consider whether substantial evidence supports the legally relevant and permissible reasons that the Board gave for denying MetroPCS's request to construct wireless facilities.

In all other respects, I concur in the majority's opinion.