*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0275p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

T-MOBILE CENTRAL, LLC,
  *Plaintiff-Appellee,*

*v.*

No. 11-1568

CHARTER TOWNSHIP OF WEST BLOOMFIELD,
  *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-13496—Denise Page Hood, District Judge.

Argued: May 30, 2012

Decided and Filed:  August 21, 2012

Before:  BOGGS and COLE, Circuit Judges; and OLIVER, District Judge[*]

_____

## COUNSEL

**ARGUED:** Drew W. Broaddus, SECREST WARDLE, LYNCH, HAMPTON, TRUEX, and MORLEY, Troy, Michigan, for Appellant.  T. Scott Thompson, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Appellee.  **ON BRIEF:** Drew W. Broaddus, SECREST WARDLE, LYNCH, HAMPTON, TRUEX, and MORLEY, Troy, Michigan, for Appellant.  T. Scott Thompson, Leslie G. Moylan, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Appellee.

_____

[*] The Honorable Solomon Oliver, Jr., Chief United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.  T-Mobile proposed to build a cellular tower in an area of West Bloomfield Township, Michigan, that had a gap in coverage.   The Township denied T-Mobile's application.  T-Mobile brought suit, alleging that the denial of the application violated the Telecommunications Act,  47 U.S.C. § 332 *et seq.*  The district court granted partial summary judgment in favor of T-Mobile, and the Township appealed.  There are three issues on appeal.  First, whether the Township's denial of T-Mobile's application to install a cellular tower was supported by substantial evidence, as required by 47 U.S.C. § 332(c)(7)(B)(iii).  Second, whether the Township's denial of T-Mobile's application had the effect of prohibiting T-Mobile from providing wireless services and thus violated 47 U.S.C. § 332(c)(7)(B)(i)(II).  This issue, which has led to a split among the circuits, presents a case of first impression for this circuit.  Finally, whether the district court should have granted summary judgment in favor of the Township on Count III of the complaint because the Township had discretion to grant or deny a special land use application under Mich. Comp. Laws § 125.3504.  We affirm the judgment of the district court.

**I**

**A**

T-Mobile, a wireless communications carrier in Michigan, identified a gap in coverage in West Bloomfield Township that adversely affected customers in that area. To remedy this gap, T-Mobile sought to construct a new wireless facility.  After initially considering several possible sites—none of which T-Mobile claimed were technically feasible or practically available—T-Mobile decided that the best option would be to construct a facility at a utility site on a property owned by Detroit Edison.  The facility contained an existing 50-foot pole, which T-Mobile wanted to replace with a 90-foot pole disguised to look like a pine tree with antennas fashioned as branches

(a "monopine"). This site was not located within the two cellular tower overlay zones designated in the Township's Zoning Ordinance (CT 1 and CT 2), where wireless facilities are considered a use permitted by right, subject only to site approval. Therefore, T-Mobile would have to seek special land-use approval and site-plan approval.

On December 17, 2008, T-Mobile filed an application with the Township to obtain special land-use approval for the proposed site. The Township Planning Commission held a hearing on February 24, 2009. At the hearing, T-Mobile presented testimony and evidence demonstrating its need to fill a gap in coverage, justification for the selection of that site and the height of the pole, an explanation of how the facility would provide for collocating[1] equipment for other cellular carriers, and a representation that the facility would have a minimal visual impact. Several members of the public spoke in opposition to granting the special land use. The areas to the north, east, and west of the proposed site were residential subdivisions, and there was a daycare center to the south. At the hearing, the Township Planning Commission passed a motion to recommend to the Board of Trustees of the Township that T-Mobile's application should be denied.

On May 27, 2009, T-Mobile submitted to the Board of Trustees additional materials in support of its application, which responded to the Township Planning Commission's objections. Specifically, T-Mobile contended that 90 feet would be the minimum height necessary in order to collocate two other carriers on the towers. Several people spoke in opposition to T-Mobile's application at the Board of Trustees hearing. On August 3, 2009, the Board denied T-Mobile's application in a letter with five stated reasons.

---

[1]The word "collocate" is also spelled as "colocate" and "co-locate" in the record.

**B**

T-Mobile sought an injunction in district court that would direct the Board of Trustees to grant its application. The complaint raised three claims. First, that the denial of its application was not supported by substantial evidence, in violation of the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(iii). Second, that the denial of its application had the "effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Third, that the denial of the permit was a violation of the Township's duty under Mich. Comp. Laws § 125.3504(3) to approve special land use applications that meet the Township's zoning ordinance requirements.

The district court granted T-Mobile's motion for partial summary judgment. First, the district court held that the Township's grounds for denial were not supported by substantial evidence. Second, the district court held that T-Mobile could not feasibly locate the facility elsewhere and that the Township had effectively prohibited the provision of wireless services. Third, because the Township violated the Telecommunications Act, it was not necessary to construe state law, and thus the question of whether the Township complied with Mich. Comp. Laws § 125.3504(3) was moot.

The Township appealed the district court's order granting T-Mobile's motion for partial summary judgment. On appeal, this court reviews the district court's grant of summary judgment de novo. *Sigley v. City of Parma Heights*, 437 F.3d 527, 532 (6th Cir. 2006).

**II**

**A**

47 U.S.C. § 332(c)(7)(B)(iii) provides: "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by *substantial evidence contained in a written record*." (emphasis added). When drafting this statute, Congress used the "substantial evidence" standard, well understood in appellate review

of administrative proceedings but a novel concern for federal courts reviewing the proceedings of local zoning boards. This court, like all others,[2] has found that the "'substantial evidence' standard of § 332 is the traditional standard employed by the courts for review of agency action." *Telespectrum, Inc. v. Pub. Serv. Comm'n of Kentucky*, 227 F.3d 414, 423 (6th Cir. 2000).

However this court's precedents do not address "substantial evidence" of *what*? In other words, if there is a denial of an application to build a wireless facility, what must the substantial evidence in the record show in order to avoid a violation of § 332(c)(7)(B)(iii)? The Ninth Circuit—in an opinion by Judge Cudahy sitting by designation from the Seventh Circuit—explained that this standard "requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable state and local law." *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400 F.3d 715, 723–24 (9th Cir. 2005). On this analysis, § 332 does not introduce a new federal substantive standard by which to assess the validity of the local law. Rather, the limited focus is on the nature of the evidence before the local zoning board and whether it is substantial. The Ninth Circuit found that it "may not overturn the Board's decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence (i.e., more than a 'scintilla' but not necessarily a preponderance)." *Id.* at 725.

The existence of "substantial evidence" in the record—as traditionally understood in the context of federal administrative law—is the standard against which federal courts consider whether a zoning board acted in conformity with the relevant local laws. So, for example, if the terms of a local zoning ordinance allow a zoning

---

[2]*See USCOC of Greater Iowa v. Zoning Bd. of Adjustment of Des Moines*, 465 F.3d 817, 821 (8th Cir. 2006) ("We agree with the Seventh Circuit that although 'it is unusual for a federal court to be reviewing the decision of a nonfederal agency, we are given no reason to suppose that the term "substantial evidence" in the Telecommunications Act bears a different meaning from the usual one.'") (quoting *PrimeCo Pers. Commc'ns v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir. 2003))*; MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400 F.3d. 715, 723 (9th Cir. 2005) (noting that "there appears to be universal agreement among the circuits" that the traditional "substantial evidence" standard applies to 47 U.S.C. § 332(c)(7)(B)(iii)); *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1218 (11th Cir. 2002) (same); *Sw. Bell Mobile Sys. v. Todd*, 244 F.3d 51, 58 (1st Cir. 2001) ("The 'substantial evidence' standard of review is the same as that traditionally applicable to a review of an administrative agency's findings of fact."); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (holding that "substantial evidence" implies this traditional standard).

board to deny a permit based on *less* than substantial evidence, or *no evidence* at all, and a permit is denied on that basis, the record would lack substantial evidence to justify the decision.  Federal review is limited to this evidentiary inquiry.  *See id.* at 724 ("[W]e must take applicable state and local regulations as we find them and evaluate the City decision's evidentiary support (or lack thereof) relative to those regulations."); *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002)  ("The TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable [local] zoning requirements.").  The "substantial evidence" standard constructs a floor below which the justification for denying a permit cannot fall—if it does, the board's decision would violate § 332(c)(7)(B)(iii).

Though this court is interpreting state substantive law, it applies the familiar substantial-evidence standard, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB.*, 340 U.S. 474, 477 (1951).  As this court noted in *Telespectrum*, we "look to whether the agency explained any credibility judgments it made and whether it gave reasons for crediting one piece of evidence over another" and "examine the evidence as a whole, taking into account whatever in the record fairly detracts from its weight." *Telespectrum*, 227 F.3d at 423.

**B**

The Township argues that its denial of T-Mobile's application was supported by substantial evidence.  In a letter to T-Mobile, the Township Clerk offered five reasons for denying the application:

> 1. That the aesthetics of the surrounding neighborhood would be affected adversely; and,
> 2. That [T-Mobile] has not accomplished an aesthetically pleasing structure; and,
> 3. That a 70-foot cellular tower could be erected in the location rather than a 90-foot cellular tower; and,
> 4. That the Zoning Ordinance (Section 26-49 a.10) specifies that the Township Board found that the presence of numerous towers and pole

structures, particularly if located within residential areas, would decrease the attractiveness of and destroy the character and integrity of the community; and,

5. T-Mobile has not presented a sufficient need to build the towers[.]

T-Mobile counters that the five reasons provided for denying the application were "conclusory, unsubstantiated assertions that do not cite any specific evidence and are not supported by substantial evidence in the record." None of these five reasons are supported by substantial evidence.

**1**

At the August 3, 2009, meeting before the Township Board, several comments were made regarding the aesthetics of the tower. Trustee Howard Rosenberg twice referred to the facility as an "ugly tower." After the hearing was opened for public comment, several residents expressed concerns about the aesthetics of the facility. Mr. Smith noted that the "existing pole was a wood pine pole with a whip antenna, [and was] very different from the proposed tower." Paul Grondin expressed concern that the tower would harm "conifers [that are] diseased and will die." Arthur White, who managed a daycare facility nearby, asked: "Would you want one of these cell towers in your back yard," and expressed concern about the tower's emissions harming children.[3] The record reflects that two letters of objection were received, but the actual letters were not made part of the record.

On appeal, the Township asserts that these objections to the facility relate to standards in § 26-49(d)(1) of the local zoning ordinance, which requires facilities to be "located and designed to be harmonious with the surrounding areas." T-Mobile argues that the wireless facility would have been disguised as a tree on a property that has numerous existing trees and that already has a 50-foot pole, asserting that "there are few—if any—wireless support structures that could be more aesthetically pleasing."

---

[3] Similar comments were made to the Township Planning Commission on February 24, 2009, by several of the same people.

While the concerns brought before the Board certainly relate to building a wireless facility that is aesthetically pleasing and "harmonious with the surrounding area," the evidence in the record is hardly substantial. The generalized complaints effectively amount to NIMBY—not in my backyard.[4] How substantial must substantial evidence be?  Substantial evidence should be substantiated. *Telespectrum*, 227 F.3d at 424 (noting that the unsupported testimony of a community resident, though "credible [and] sympathetic[,] . . . was no more than unsupported opinion" and was not substantial evidence).   The evidence relied on by the Board of Trustees was merely alleged,  not substantiated.  There was no evidence whatsoever that the wireless facility would have any impact on the conifers, beyond Mr. Grondin's accusation.   Further, concerns that the RF emissions could potentially impact trees or children at the daycare were prohibited by statute as grounds to deny a wireless permit. "[N]o state or local government or instrumentality thereof may regulate the construction of personal wireless facilities on the basis of the environmental effects of RF emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv);  *Telespectrum*, 227 F.3d at 424 ("[C]oncerns of health risks due to the emissions may not constitute substantial evidence . . . .").

General concerns from a few residents that the tower would be ugly or that a resident would not want it in his backyard are not sufficient.  *New Par v. City of Saginaw*, 301 F.3d 390, 399 n.4 (6th Cir. 2002) (citing *Petersburg Cellular P'ship v. Bd. of Supervisors*, 205 F.3d 688, 695 (4th Cir. 2000) ("If, however, the concerns expressed by the community are objectively unreasonable, such as concerns based upon conjecture or speculation, then they lack probative value and will not amount to substantial evidence.")).

---

[4]Several of the concerned citizens and members of the Board specifically mentioned their backyards during the August 3, 2009, meeting.  ("But I need to know if a resident says, you put an ugly tower in my *backyard* and you potentially decrease my property value; [m]y *backyard* is kind of where they're going to put this thing; [b]ut the final word is, would you want one of these cell towers in what would be, if I build a house there or build houses there, in my *backyard*?; [w]ould you want that in your *backyard*; [t]here will be towers and towers, and pretty soon I'll have Disneyland in my *backyard*.") (emphases added).

If § 332 were read as broadly as the Township suggests and these generalized objections sufficed, any wireless facility could be rejected.  Anyone who opposed a cell tower in their backyard could offer an excuse that it would be bad for the community, would not be aesthetically pleasing, or would be otherwise objectionable.  But that by itself is not enough.  There must be evidence.  And not just any evidence—evidence that is *substantial*.   And substantial evidence must be substantiated by something. "Substantial evidence, in the usual context, has been construed to mean less than a preponderance, but more than a scintilla of evidence."  *Cellular Tel. Co.*, 166 F.3d at 494.

The fourth reason provided is that "the Zoning Ordinance (Section 26-49 a.10) specifies that the Township Board found that the presence of numerous towers and pole structures, particularly if located within residential areas, would decrease the attractiveness of and destroy the character and integrity of the community."  Section 26-49(a)(10) of the zoning ordinance states: "The township board finds that *the presence of numerous tower and/or pole structures, particularly if located within residential areas, would decrease the attractiveness and destroy the character and integrity of the community*." (emphasis added).  The former stated reason simply parrots the language of the ordinance.   Merely repeating an ordinance does not constitute substantial evidence.  *See, e.g.*, *T-Mobile Ne. LLC v. City of Lawrence*, 755 F. Supp. 2d 286, 291 (D. Mass. 2010).  Further, the evidence in the record suggests quite the contrary.  There were not numerous towers or poles in that area—in fact, the lack of wireless towers in that area was the reason why T-Mobile sought to build one.

The Township's reasons for denial concerning aesthetics were not based on substantial evidence in the record.

**2**

The Township asserts that there is substantial evidence in the record  showing that a 70-foot tower would have sufficed rather than the proposed 90-foot tower.  T-Mobile counters that under the local zoning ordinance, it was required to collocate other wireless carriers on a new tower and could not have feasibly done so on a 70-foot tower.

The zoning ordinance states a goal of collocation—that is, locating several carriers on the same tower—and building only as many new wireless facilities as necessary. *See* Sections 26-49(a)(9) ("This contemplates the establishment of as few structures as reasonably feasible, and the use of structures which are designed for compatibility, including the use of existing structures"); 26-49(g)(3)c ("The policy of the community is to promote colocation"). Section 26-49(g)(3)b of the zoning ordinance states that "[a]ll new and modified wireless communication facilities shall be designed and constructed so as to accommodate colocation."   Section 26-49(b)(4) defines collocation as "the location by *two (2) or more* wireless communications providers of wireless communication facilities on a common structure, tower, or building, *with the view toward reducing the overall number of structures required to support wireless communication antennas within the community*." (emphases added). Section 26-49(e)(1) of the ordinance provides that "[t]he maximum height of the new or modified support structure and antenna shall be the minimum height demonstrated to be necessary for reasonable communication by the applicant (and by other entities to collocate on the structure)."

By the terms of the ordinance, any new facility was required to collocate "two (2) or more wireless communications providers."  Further, the structure would have to be tall enough in order to support "reasonable communication" for at least two carriers. The Township denied T-Mobile's application, in part, because the Township found that "a 70 foot cellular tower could be erected in the location rather than a 90 foot cellular tower." To support this reasoning, the record would have to contain substantial evidence that a 70-foot tower would have permitted two collocated carriers to engage in "reasonable communication."[5]

The record contains letters from AT&T and Verizon who expressed a desire to collocate with T-Mobile on the "90' monopine" tower. "There must be at least ten feet of vertical separation between the antennas of the various wireless companies

---

[5]On appeal, the Township suggests that a 75-foot or 80-foot tower could have also been appropriate.  However, the reason in the denial letter concerned a 70-foot, rather than a 90-foot, tower. This is the issue before the court on appeal.  Appellant Br. at 31.

collocating on the tower." The letter from Verizon requested to "occupy the second available level of this structure, which would be [at] approximately 77'." Verizon's letter noted that it had "been in search [sic] to construct such a facility in this area for a great amount of time." AT&T's letter expressed interest "on the condition that all zoning approvals are secured."**[6]**

There is no evidence in the record to support the Township's position that a 70-foot tower would have been suitable to satisfy the zoning ordinance's requirement that two wireless providers, engaged in reasonable communication, could be collocated at this particular site. Appellant misreads the record when it claims that Verizon would have been willing to collocate on a 70-foot tower with Verizon's equipment placed at the 60-foot level. Here is the relevant colloquy from the Board of Trustees meeting:

> MR. DOVRE (Trustee): I'm asking if you're willing to co-locate that low?
> MR. ANDERS (Representative from Verizon): We're willing to co-locate on the tower at a height that the tower owner would provide to us.
> MR. DOVRE: As low as 70 feet?
> MR. ANDERS: Yes.
> MR. DOVRE: How long [*sic*—should be low] would you co-locate at?
> MR. ANDERS: As low as 70 feet.
> MR. DOVRE: 60?
> MR. ANDERS: I'd have to—70 feet is right now the—

The questions posed asked for the minimum height at which Verizon was willing to collocate, not for the height the structure would be. In the original letter, Verizon sought to collocate at around 80 feet but was willing to compromise at 70 feet (presumably because AT&T was no longer in the picture). Since Verizon was not building the structure—T-Mobile was—the ultimate height would have been mostly irrelevant to Verizon. What mattered was the height at which Verizon's equipment would be located.

A 70-foot tower, with Verizon collocated at 60 feet, would not, by Verizon's own admission, have worked. In other words, if Verizon's equipment was positioned as low

---

**[6]** However, it seems AT&T's support may have waned after opposition emerged to the facility, as it did not participate in the Township Board meeting.

as 70 feet, T-Mobile's equipment would be placed above it, making the height of the structure greater than 70 feet (likely 80 feet). Simply stated, the evidence in the record only shows that if T-Mobile were to build a tower with two collocated carriers as the ordinance requires, the height would *have* to be greater than 70 feet tall. The evidence does not show that a 70-foot tower would have been possible.

T-Mobile even offered to build a 70-foot tower if no other carriers collocated (while this arguably would have violated the ordinance's collocation requirement, it resulted from T-Mobile's trying to accommodate the Township). At the August 3, 2009, meeting, after Trustee Kaplan mentioned that "[w]e also felt that a 70 foot tower would have been sufficient," a representative of T-Mobile replied that if no other carriers were interested in collocating, "I would like to go on the record as saying, if you're willing to approve a 70 foot tower, I'm willing to take one." Following the colloquy with the Verizon representative, a motion was made to the Township Board to "remand the issue to the planning commission for consideration of a 70 foot tower." The motion was seconded but not approved.

The Township's position creates an untenable situation for T-Mobile. If T-Mobile built a 70-foot tower that only supported one provider (T-Mobile), it would violate the ordinance that requires collocation. If T-Mobile built a 70-foot tower that also collocated another provider (Verizon), it would violate the ordinance (Section 26-49(d)(1)e.1) that requires the structure to be the "minimum height demonstrated to be necessary for reasonable communication by the applicant (and by other entities to collocate on the structure)." The shorter collocated tower wouldn't work for Verizon. T-Mobile even offered to build a 70-foot tower if no other carriers were collocated, and the Board did not adopt this proposal. By the very terms of the ordinance and the Board's decisions, T-Mobile could not build the structure under any circumstances. Nothing in the record supports the ultimate decision that the Township made with respect to height. The Township's reason for denial of the application with respect to the height of the tower was not supported by substantial evidence.

**3**

The fifth reason offered for the denial of T-Mobile's application was that "T-Mobile has not presented a sufficient need to build the towers [*sic*]." During the hearing, T-Mobile submitted a report from its RF engineer that contained coverage maps and other data. The Township raises several objections to the report. First, that the engineer's analysis about the coverage gap did not contain any actual customer complaints;[7] second, that the coverage maps "were not based upon any empirical data"; and third, that the "proposed tower would do nothing to improve coverage to the south and east."

These three objections were only raised during the course of litigation—none were stated in the record. Further, none of these arguments cite any evidence in the record—rather, the Township merely cites its own briefs from the district court.[8] These arguments are not properly before this court. The only issue before this court is whether substantial evidence existed to support the denial of the application based on need, as defined by the local zoning ordinance. *MetroPCS*, 400 F.3d at 724 ("[W]e must take applicable state and local regulations as we find them and evaluate the City decision's evidentiary support (or lack thereof) relative to those regulations."). Section 26-49(d)(2)a lists several factors to consider in determining need:

> a. The applicant shall demonstrate the need for the proposed facility to be located as proposed based upon the presence of one or more of the following factors:
> l. Proximity to an interstate or major thoroughfare.
> 2. Areas of population concentration.
> 3. Concentration of commercial, industrial, and/or other business centers.
> 4. Areas where signal interference has occurred due to tall buildings, masses of trees, or other obstruction.

---

[7] There is no requirement in the ordinance, or in federal law, that requires the submission of consumer complaints.

[8] In its brief, the Township cites both Defendant's Answer to Plaintiff's Motion for Partial Summary Judgment and the Reply Brief to Plaintiff, T-Mobile Central, LLC's Answer to Defendant Charter Township of West Bloomfield's Motion for Summary Judgment to support these three positions. Appellant Br. at 31–32. The cited sections of the district-court filings included no citations to the record or any exhibits. These citations are inapposite for purposes of appellate review.

> 5. Topography of the proposed facility location in relation to other facilities with which the proposed facility is to operate.
> 6. Other specifically identified reason(s) creating facility need.

The reason stated in the record with respect to this ground is that "T-Mobile has not presented a sufficient need to build the towers [*sic*]."

The only evidence in the record that the Township cites to support the assertion that there was not a sufficient need for the tower was testimony from Mr. Dave Crook at the February 24, 2009, Planning Commission meeting.[9] Mr. Crook stated that the proposed facility would only address 15% of T-Mobile's coverage problem. Mr. Crook provided no explanation of how he reached this number, nor did he dispute any of the facts in the RF engineer's report. Nothing in the record suggests what qualifications Mr. Crook possessed or whether he had any expertise to opine on the coverage gap in the area. His ostensibly lay opinion is not substantial evidence. *MIOP, Inc. v. City of Grand Rapids*, 175 F. Supp. 2d 952, 956–57 (W.D. Mich. 2001) (citing *Telespectrum*, 227 F.3d at 424) ("Instead, the cases cited by the Sixth Circuit remark that opinion is not sufficient to meet the substantial evidence requirement. Consistent with Sixth Circuit precedent, this Court does not find lay opinion evidence sufficient to satisfy the substantial evidence requirement.").

To the contrary, based on the terms of the Township's own zoning ordinance, T-Mobile introduced voluminous amounts of evidence to support its position that there was a sufficient need for the tower. The engineer's report went through each of the six factors listed in the ordinance and explained why the proposed facility met each requirement: (1) the proposed facility is in close proximity to major thoroughfares in the area; (2) the surrounding area is "heavily populated by subdivisions on both sides of the roads"; (3) the area is "composed of major township roads and an established residential

---

[9] It is unclear if the Board of Trustees voted on August 3, 2009, based on the comments made to the Township Planning Commission on February 24, 2009, or if the Board only considered the recommendation made by the Township Planning Commission. In any event, the comments made at the February 24, 2009, meeting are part of the record that this court can consider on appeal. This court "examine[s] the evidence as a whole, taking into account whatever in the record fairly detracts from its weight." *Telespectrum*, 227 F.3d at 423.

population"; (4) "topography and the dense population of all types of trees do cause considerable signal interference in the area"; (5) "it's very difficult to find open level ground upon which to build such a facility"; and (6) noting that the lack of "coverage in this area is a long-standing issue," this proposal would "not only fill coverage gaps for in-car usage . . . [but also for] in-home coverage." These arguments were supported by detailed reports and coverage maps. There is not substantial evidence in the record to support the Township's denial of the application with respect to need.

**4**

Because the five stated reasons for denial of T-Mobile's application were not supported by substantial evidence, the district court correctly found that the Township's decision violated 47 U.S.C. § 332(c)(7)(B)(iii).

Summary judgment was appropriate for this claim.

**III**

**A**

Next, we consider whether the Township's denial of T-Mobile's application violated 47 U.S.C. § 332(c)(7)(B)(i)(II), which provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not prohibit or *have the effect of prohibiting* the provision of personal wireless services." (emphasis added). The construction of this statute presents a question of first impression for this circuit.

As a threshold matter, we must first determine whether the denial of a *single application* from T-Mobile can constitute an effective prohibition. The Township places great stock in precedents from the Fourth Circuit, which has held that *only* a general, blanket ban on the construction of all new wireless facilities would constitute an "impermissible prohibition of wireless services under the TCA." *MetroPCS*, 400 F.3d at 730 (citing *AT&T Wireless PCS v. City Council of Virginia Beach*, 155 F.3d 423, 428 (4th Cir. 1998) (holding that only "blanket prohibitions" and "general bans or policies"

affecting all wireless providers count as effective prohibition of wireless services under the TCA)).

However, the large majority of circuits have rejected this approach.  Most recently, the Ninth Circuit noted that, under such a strict construction, "persistent coverage gaps can never constitute a prohibition under the statute—courts must ask only whether local governments have (effectively) banned wireless services altogether. . . . The language of the TCA, while sparse, does not dictate such a narrow interpretation even under a plain meaning approach." *MetroPCS*, 400 F.3d at 730*; see also Second Generation Props., LP v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002) (holding that the clause "is not restricted to blanket bans on cell towers" and that "[t]he clause may, at times, apply to individual zoning decisions."); *Voicestream Minneapolis, Inc. v. St. Croix Cnty.*, 342 F.3d 818, 830 (7th Cir. 2003); *APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler Cnty.*, 196 F.3d 469, 479–80 (3d Cir. 1999);  *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 640 (2d Cir. 1999). Judge Cudahy in *MetroPCS* formulated a two-part test to consider whether the denial of an application amounts to an effective prohibition: there must be (1) a "showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations." *MetroPCS*, 400 F.3d at 731.  Both the Township and T-Mobile urge this court to adopt this test.

The statute itself refers to actions that "have the *effect of* prohibiting the provision of personal wireless services."  (emphasis added.)  Not simply *prohibiting it*, but effectively prohibiting it.  Thus, actions short of a complete prohibition could have the effect of improperly hindering the construction of cellular towers.  The cramped reading of the Fourth Circuit—which requires a blanket ban to trigger a violation of the statute—seems inconsistent both with the plain text of the statute as well as the broader goal of the TCA to promote the construction of cellular towers.  We now adopt the *MetroPCS* standard and hold that the denial of a single application can constitute a violation of this portion of the Act.

**B**

**1**

Next, we must determine, as a matter of first impression, whether the "significant gap" in service focuses on the coverage of the applicant provider (T-Mobile in this case) or whether service by any other provider (Verizon, AT&T, Sprint, etc.) is sufficient. That is, if an incumbent provider has coverage in a given area but a new provider seeking to construct a wireless facility does not, does a "significant gap" in coverage exist? The Second and Third Circuits have held that no "significant gap" exists if any "one provider" is able to serve the gap area in question. *See, e.g.*, *APT Pittsburgh*, 196 F.3d at 478–80; *Willoth*, 176 F.3d at 643. Likewise, the Fourth Circuit adopted the "one provider rule," holding that allowing carriers an individualized cause of action "would effectively nullify local authority by mandating approval of all (or nearly all) applications." *AT&T Wireless*, 155 F.3d at 428. In other words, under this approach, if Verizon has coverage in an area but T-Mobile does not, T-Mobile cannot claim to have a service gap.

The Ninth Circuit rejected the "one provider" rule and adopted a standard that considers whether "a provider is prevented from filling a significant gap in *its own* service coverage." *MetroPCS*, 400 F.3d at 733. The First Circuit has also adopted this rule and observed that "[t]he fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers." *Second Generation Props.*, 313 F.3d at 634. Under this approach, if Verizon had coverage in an area but T-Mobile did not, T-Mobile could still claim to have a service gap.

In 2009, the FCC issued a Declaratory Ruling that explained that the effective prohibition provision requires only a showing that a carrier has a "significant gap" in *its own* service coverage—the approach of the First and Ninth Circuits:

> While we acknowledge that this provision could be interpreted in the manner endorsed by several courts [(the Second, Third, and Fourth Circuits)]—as a safeguard against a complete ban on all personal

wireless service within the State or local jurisdiction, which would have no further effect if a single provider is permitted to provide its service within the jurisdiction—we conclude that under the better reading of the statute, this limitation of State/local authority applies not just to the first carrier to enter into the market, but also to all subsequent entrants.

*In re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B)*, 24 FCC Rcd. 13994, ¶ 57 (2009). The FCC found persuasive the First Circuit's reasoning:

> We reach this conclusion for several reasons. First, our interpretation is consistent with the statutory language referring to the prohibition of "the provision of personal wireless services" rather than the singular term "service." As the First Circuit observed, "[a] straightforward reading is that 'services' refers to more than one carrier. Congress contemplated that there be multiple carriers competing to provide services to consumers."

*Id.* ¶ 58 (quoting *Second Generation Props.*, 313 F.3d at 634). The FCC expressly rejected the "blanket ban" approach adopted by the Second, Third, and Fourth Circuits: "Third, we find unavailing the reasons cited by the Fourth Circuit (and some other courts) to support the interpretation that the statute only limits localities from prohibiting all personal wireless services (i.e., a blanket ban or 'one-provider' approach)." *Id.* ¶ 60. From the perspective of a customer who has poor coverage with T-Mobile in a certain area, it is little consolation that another provider, Verizon for example, may have good service in the same area.

The Eastern District of Michigan found this FCC ruling dispositive in holding that the "significant gap" refers only to a carrier's *own* service, not that of any carrier. *T-Mobile Cent. LLC v. City of Fraser*, 675 F. Supp. 2d 721, 729 (E.D. Mich. 2009) (noting that "the Sixth Circuit has not spoken on this issue," but acknowledging the Declaratory Ruling and concluding that "the Court is not required to consider whether other carriers provide service in the area of the gap"). In light of the FCC's endorsement of the standards used by the First and Ninth Circuits, we now adopt this approach.

**2**

The analysis of whether a significant gap in coverage existed closely tracks our earlier discussion about whether T-Mobile demonstrated a need to build the facility.  The Township  raises two of the same three arguments to assert that T-Mobile failed to establish a coverage gap.  First, that "the record was devoid of any evidence of actual customer complaints," and second, that the report was "not based upon any empirical data."  Appellant Br. at 38.[10]  Again, the Township merely cites its own briefs to support these arguments.

First, there is no requirement under federal or state law that actual customer complaints need to be submitted to demonstrate a coverage gap.  Second, it is unclear exactly what the Township means by asserting that the coverage maps were not based on any empirical data.  The engineer's report was replete with coverage maps, measurements of signal strengths, and other calculations.  The Township introduced no evidence into the record to show that the gap was not significant beyond general complaints and comments from citizens that other wireless carriers had good coverage in that area.  In fact, several residents acknowledged that T-Mobile had poor coverage or "dead zones" in the area.

T-Mobile introduced into the record RF propagation maps and drive test data, along with a report by an RF engineer (which is discussed in detail *supra* Part II.B.3.).  These types of evidence are suitable to support a claim for a substantial gap in coverage.  *See, e.g.*, *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 2006 WL 1699580, at \*11 (N.D. Cal. June 16, 2006) (finding that propagation maps can demonstrate the existence of a coverage gap).  T-Mobile claims that the relevant evidence shows that the gap is "significant" because the "gap area includes both a major commuter highway and fully developed residential areas."  As discussed in Part II.B.3 above, both of these assertions are amply supported by the RF engineer's affidavit.

---

[10] Here, the Township does not make the third argument—"the maps indicate that the proposed tower would do nothing to improve coverage to the south and east, or anything greater than about 15%." In any event, that unsubstantiated argument is without merit, as discussed *supra* Part II.B.3.

Based on the record, we find that the denial of T-Mobile's application "prevented [T-Mobile] from filling a significant gap in *its own* service coverage." *MetroPCS*, 400 F.3d at 733.

**C**

The second part of the *MetroPCS* inquiry focuses on whether there are feasible alternate locations. "Under all existing versions of the 'significant gap' test, once a wireless service provider has demonstrated that the requisite significant gap in coverage exists, it must then make some showing as to the intrusiveness or necessity of its proposed means of closing that gap." *MetroPCS*, 400 F.3d at 734. The circuits split at this fork:

> The Second and Third Circuits require the provider to show that ''the manner in which it proposes to fill the significant gap in service is the *least intrusive on the values that the denial sought to serve*.'' *Penn Township*, 196 F.3d at 480 (emphasis added); *see also Omnipoint*, 331 F.3d 398; *Unity Township*, 282 F.3d at 266; *Willoth*, 176 F.3d at 643. The First and Seventh Circuits, by contrast, require a showing that there are ''no alternative sites which would solve the problem.'' *Second Generation Props.*, 313 F.3d at 635; *see also St. Croix County*, 342 F.3d at 834–35 (adopting the First Circuit test and requiring providers to demonstrate that there are no ''viable alternatives''). . . .

*MetroPCS*, 400 F.3d at 734. The Ninth Circuit adopted the "least intrusive" standard. *Id.* at 735. Judge Cudahy found the precedents from the First and Seventh Circuit "too exacting." *Id.* at 734. The Second and Third Circuit's "least intrusive" standard "allows for a meaningful comparison of alternative sites before the siting application process is needlessly repeated." *Id.* at 734–35.

We agree with Judge Cudahy and adopt the "least intrusive" standard from the Second, Third, and Ninth Circuits. It is considerably more flexible than the "no viable alternatives" standard, as a carrier could endlessly have to search for different, marginally better alternatives. Indeed, in this case the Township would have had T-Mobile search for alternatives indefinitely.

Under the "least intrusive" standard, the analysis is straightforward, and T-Mobile satisfies its burden. *See Omnipoint*, 331 F.3d at 398 (noting that the "least intrusive" standard "will require a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc."). T-Mobile made numerous good-faith efforts to identify and investigate alternative sites that may have been less intrusive on the "values that the denial sought to serve." *Penn Twp.*, 196 F.3d at 480. Specifically they considered building a monopole near the West Hills High School and on a water tower at the Knollwood Country Club. A facility at the High School would have been significantly more intrusive to the values of the community, as demonstrated by the widespread opposition to that proposal. Also, T-Mobile determined that a facility at the Knollwood Country Club location would have been too far away from the area with weak service and would not have resolved the coverage gap. The Township suggested no other alternatives beyond the two already proposed. This evidence is sufficient to make the requisite "showing as to the intrusiveness or necessity of its proposed means of closing that gap." *MetroPCS*, 400 F.3d at 734.

The Township's decisions had "the effect of prohibiting the provision of personal wireless services" and thus violated 47 U.S.C. § 332(c)(7)(B)(i)(II).

## IV

Remaining is the state-law claim, M.C.L. 125.3504, which the district court declined to address, finding that the violation of the Telecommunications Act renders the issue moot. Because we hold that the Township's actions violated the Telecommunications Act, we also need not address the state-law claim.

## V

The judgment of the district court is AFFIRMED.