**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-13713

————————————

T-MOBILE SOUTH, LLC,

*Plaintiff-Appellee,*

*versus*

CITY OF ROSWELL, GEORGIA,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:10-cv-01464-AT

————————————

Before WILLIAM PRYOR, Chief Judge, ABUDU, Circuit Judge, and
CONWAY,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

———————————————

[*] The Honorable Anne C. Conway, United States District Judge for the Middle
District of Florida, sitting by designation.

This appeal requires us to decide whether the federal ban of local "regulation" that "prohibit[s] or ha[s] the effect of prohibiting" the provision of cellular services applies to a municipal decision to deny an individual permit application. 47 U.S.C. § 332(c)(7)(B)(i). Sixteen years ago, T-Mobile applied for permission to build a new cell phone tower in the City of Roswell, which denied the application. T-Mobile sued and alleged that the denial prevented it from providing service to some customers. The district court ruled in favor of T-Mobile after concluding that Roswell's denial prevented T-Mobile from filling a gap in its services and that building a cell tower at its preferred location was the least intrusive means of filling that gap. Because T-Mobile may challenge only Roswell's "regulation" of cell tower siting under the effective prohibition provision, not the denial of a single permit, we vacate and remand for further proceedings.

## I. BACKGROUND

In February 2010, T-Mobile South "applied to build a new, 108-foot-tall cell phone tower on 2.8 acres of vacant residential property in the city of Roswell, Georgia." *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 296 (2015). A zoning ordinance required permits for "all new wireless . . . facilities," and it allowed their approval or denial based on "consideration" of nine factors. Roswell denied the application. *Id*. at 298.

T-Mobile sued Roswell under the Telecommunications Act of 1996. Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in U.S.C. Titles 15, 18, and 47). It alleged three claims for relief: first,

that the denial of its application "was not supported by substantial evidence" in a written record; second, that denial of its application rendered it "unable to fill a gap in coverage necessary to provide competitive, reliable, uninterrupted, in-building wireless telephone services"; and third, that denial of its application "ha[d] the effect of unreasonably discriminating among providers of functionally equivalent services." T-Mobile sought an injunction requiring Roswell to issue the requested permit.

The district court entered summary judgment for T-Mobile because Roswell failed to "issue a written decision." We reversed, *see T-Mobile S., LLC v. City of Roswell*, 731 F.3d 1213, 1214 (11th Cir. 2013), and the Supreme Court reversed our decision for a different reason, *see* 574 U.S. at 307–08. We then remanded the case to the district court.

The district court concluded that Roswell had provided substantial evidence to deny the application and granted Roswell's motion for summary judgment on that claim. It then considered, for the first time, T-Mobile's claim that Roswell had effectively prohibited the provision of wireless services by denying its application. The district court ruled that the effective prohibition provision applied to the "denial of a single permit application." And it adopted the "significant gap" test, which required T-Mobile to prove "a significant gap in its own service coverage" and "that the proposed tower [was] the least intrusive means of closing that gap." It con-

cluded that T-Mobile had satisfied that test, but because the evidence was "six years old," it remanded the case to Roswell to reconsider the permit application and create a new record.

Roswell denied T-Mobile's application again in 2017, and the parties proceeded to a bench trial. The district court ruled in favor of T-Mobile. It found that T-Mobile faced a significant "gap in service" that the proposed tower would remedy. It then found that T-Mobile had no viable alternative means to close the gap. So the district court enjoined Roswell to "issue all necessary permits and approvals and authorize construction of the tower."

On appeal, Roswell asked us to reverse the district court's application of the significant gap test, and T-Mobile defended it. Neither party questioned the use of that test. We *sua sponte* directed the parties to discuss at oral argument "whether denial of a single permit qualifies as 'the regulation of placement'" under the Act. After oral argument, we directed the parties to address in supplemental briefing whether "'the regulation of the placement, construction, and modification of personal wireless service facilities' includes the denial of a single permit to build a facility." 47 U.S.C. § 332(c)(7)(B)(i). T-Mobile argued that it did; Roswell argued that it did not.

## II. STANDARD OF REVIEW

On appeal from a bench trial, "we review *de novo* both conclusions of law and the application of the law to the facts." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 921 (11th Cir. 2023).

## III. DISCUSSION

The Telecommunications Act of 1996 "generally preserves the traditional authority of state and local governments to regulate the location, construction, and modification of wireless communications facilities like cell phone towers, but imposes specific limitations on that authority." *Roswell*, 574 U.S. at 300 (citation and internal quotation marks omitted). "One of those limitations," *id.*, is that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities" by state and local governments "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i). Although this appeal is our first opportunity to interpret this provision, we are not the first circuit to do so.

So far, federal courts have largely assumed that "the *regulation* of" cell tower siting includes the denial of a single permit. *See, e.g.*, *Town of Amherst v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 14 (1st Cir. 1999); *T-Mobile Ne. LLC v. Fairfax Cnty. Bd. of Supervisors*, 672 F.3d 259, 266 (4th Cir. 2012). Other circuits have developed a test for effective prohibition tailored to denials of a single permit. That significant gap test asks whether a proposed wireless facility is the "least intrusive means" or "only feasible plan" to close a "significant gap" in wireless services. *E.g.*, *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 48, 50 n.8 (1st Cir. 2009); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999); *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 805, 808 (6th Cir. 2012); *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818,

833–35, 834 n.7 (7th Cir. 2003); *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 995 (9th Cir. 2009).

Yet, courts have failed to explain why any version of the significant gap test is a faithful interpretation of section 332(c)(7)(B)(i). As the Third Circuit has stated, the test is hardly "tethered to the text," and the courts that initially derived it did so without performing "any statutory construction." *Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 103 (3d Cir. 2023). Other circuit courts have debated only questions internal to the test without attempting to justify it from first principles. *See, e.g., MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 731–35 (9th Cir. 2005); *W. Bloomfield*, 691 F.3d at 805–08.

We conclude that the significant gap test fails at the threshold: the effective prohibition provision applies only to state and local "regulation of" cell tower siting, not to individual siting decisions. 47 U.S.C. § 332(c)(7)(B)(i). The text, context, and structure of subsection (c)(7) each reinforce our conclusion.

As always, we "begin[] with the statutory text." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). Subsection (c)(7)(B)(i) places "[l]imitations" on "[t]he regulation of the placement, construction, and modification of personal wireless service facilities." Contemporaneous dictionaries inform us that "regulation" is "[t]he act or process of controlling *by rule or restriction*." *Regulation*, BLACK'S LAW DICTIONARY (7th ed. 1999) (emphasis added). Because "regulation" is used to describe the process of regulating, we look to what it means to "regulate." Regulate too carries the primary

meaning "to govern or direct according to rule." *Regulate*, WEBSTER'S THIRD NEW INT'L DICTIONARY 1913 (1993); *see also Regulate*, WEBSTER'S NEW INT'L DICTIONARY 1798 (1920) (defining "regulate" as "[t]o adjust or control by rule, method, or established mode; to direct by rule or restriction"); *Regulate*, OXFORD ENGLISH DICTIONARY 379 (1961) (defining "regulate" as "[t]o control, govern, or direct by rule or regulations"); *Regulate*, AM. HERITAGE DICTIONARY 6070 (3d ed. 1992) (defining the term as "[t]o control or direct according to rule, principle, or law"). These nearly identical definitions inform us that the "common or ordinary meaning," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012), of "the regulation of" siting entails control by rule or restriction. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1938 (2022) ("to *regulate* something is usually understood to mean to 'fix the time, amount, degree, or rate' of an activity 'according to rules'" (alteration adopted) (citation omitted)).

The definitions rule out the denial of a permit application from the scope of the effective prohibition clause. A local government does not control the uses of property by rule or restriction when it denies a permit; it declines to give a property owner permission to use his property in a way otherwise disallowed by the ordinance. And the "limitation[s]" on the use of that property come from the *rules* the locality applies to property. *Restriction*, WEBSTER'S THIRD, *supra*, 1937. Properly understood, subsection (c)(7)(B)(i) limits only the ability of municipalities to control facility siting *by rules*, not by individual zoning decisions.

T-Mobile agrees with us that the noun "regulation" here is the nominalization of the verb "regulate." And it cites some of the same dictionary definitions we do. But it focuses entirely on the term "control": because local governments "exercis[e] control over the placement of wireless facilities through decisions on specific siting requests," it argues, doing so *is* regulating.

This reading requires us to ignore the limiting modifier in the definition, which tells us what *type* of control is meant by the term "regulate." *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021) (holding that a modifier in a statutory definition limits the scope of the terms). As T-Mobile's chosen dictionary tells us, that control is "according to rule, principle, or law." *Regulate*, AM. HERITAGE DICTIONARY, *supra*, 6070. A locality may control siting through individual permit decisions, but those decisions are not "rule[s], principle[s], or law[s]." *Id*. If those decisions are "[i]n keeping with" the rules, *According to*, AM. HERITAGE DICTIONARY, *supra*, 132, then the object of the provider's challenge is the rule itself, not the zoning decision.

The statutory context confirms our reading: "regulation" is a subset of "decisions." Subsection (c) is titled "Regulatory treatment of mobile services," and it grants the Federal Communications Commission substantial regulatory authority and presumptive preemption of some state regulation. 47 U.S.C. § 332(c)(1)–(3). Subsection (c)(7) preserves "local zoning authority" from the section's preemptive scope. It begins by clarifying that, outside the limitations to follow, "nothing in this chapter shall limit or affect

the authority of a State or local government . . . over *decisions* regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A) (emphasis added). Everything that follows in subsection (c)(7)(B) is a "[l]imitation[]" on that general authority to make "decisions" about cell tower siting. "Regulation" is a category of "decisions" about cell tower siting, not the inverse.

Subsection (c)(7)(B) limits local authority in two categories of "decisions." The statutory text uses "regulation" when imposing substantive limits on local authority, and it uses the singular term "decision" for procedural acts. Subsection (c)(7)(B)(i) bars localities from regulating siting decisions if a regulation has one of two *substantive* effects: unreasonable discrimination against providers or "the effect of prohibiting the provision of personal wireless services." And subsection (c)(7)(B)(iv) similarly limits the ability of localities to "regulate" tower placement or construction "on the basis of the environmental effects of radio frequency emissions." On the other hand, Congress required state and local governments faced with "request[s] for authorization to place, construct or modify personal wireless service facilities" to act on them "within a reasonable period of time." *Id*. § 332(c)(7)(B)(ii). And it further required that "[a]ny decision by a State or local government . . . to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." *Id*. § 332(c)(7)(B)(iii).

Because Congress used "materially different term[s]" in the same subsection, we presume that it expressed a "different idea." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 25, at 170 (2012). If Congress meant to impose substantive limitations on individual cell tower siting *decisions*, it could have done so by using the exact term it used in subsection (c)(7)(A). When Congress imposed *procedural* limitations on permit denials, it used the term "decision" with an additional qualifier: the "decision" in question is "to deny a request" from a provider. 47 U.S.C. § 332(c)(7)(B)(iii). Congress had a term broad enough to cover both regulation and permit denials, and a phrase nearly specific to permit denials. But it used neither in imposing substantive limitations on local authority.

T-Mobile presents two alternative theories. It approvingly cites three district court opinions concluding that subsection (c)(7)(B) allows only challenges to individual zoning decisions. *See*, *e.g.*, *Cox Commc'ns PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d 1272, 1277 (S.D. Cal. 2002) (ruling that because section 253 allows providers to challenge state or local ordinances, an interpretation of subsection (c)(7)(B) allowing them to do the same "would be superfluous"); *Sprint Telephony PCS, L.P. v. County of San Diego*, 377 F. Supp. 2d 886, 891–92 (S.D. Cal. 2005) (ruling that subsection (c)(7)(B) permits challenges to "decisions on individual applications"); *Verizon Wireless LLC v. City of Rio Rancho*, 476 F. Supp. 2d 1325, 1337 (D.N.M. 2007) (ruling that subsection (c)(7) "refers only to individual zoning decisions"). But these opinions fail to explain

why, if Congress meant "regulation" to mean *only* individual decisions, it did not use the term "decision" in subsection (c)(7)(B)(i) and (iv). Nor do they explain why Congress used language specific to permit applications in subsection (c)(7)(B)(ii) and (iii).

T-Mobile acknowledges that the term "regulation" means more than individual zoning decisions. It would have us read "regulation" to include both "control[] by rule" and "individual permit decisions." But that reading leaves no gap in meaning between "decisions" and "regulation." And it too fails to explain Congress's use of "regulation" rather than "decision" in subsection (c)(7)(B)(i). Congress intended the substantive limitations on local decisions to permit challenges to rules, not to impose a new-born body of substantive federal common law on all zoning decisions.

The internal logic of subsection (c)(7)(B) also cuts in favor of the narrower reading of "regulation." Only subsection (c)(7)(B)(iv) could theoretically be violated by an individual zoning decision if that decision was based on "the environmental effects of radio frequency emissions." But how could an individual siting decision *possibly* violate subsection (c)(7)(B)(i)(I), which requires that "regulation" not "unreasonably discriminate among providers"? At least *two* zoning decisions are necessary to prove differential treatment.

T-Mobile nevertheless argues that we have previously applied the unreasonable discrimination provision to an individual siting decision. In *Michael Linet, Inc. v. Village of Wellington*, we concluded that an unreasonable discrimination claim failed because the provider failed to prove its proffered comparator was similarly

situated. *See* 408 F.3d 757, 762 (11th Cir. 2005). But *Michael Linet* did not interpret the text of section 332(c)(7)(B)(i). Nor does *Michael Linet* conflict with a plain-meaning interpretation of "regulation" that requires a provider to challenge a zoning rule. Our decision recognized only that a comparator complaint of discrimination fails on its own terms when the comparator is not similar in all material respects.

The "effective prohibition" provision too requires consideration of the broader "regulation" of siting decisions. Denial of a single permit to build a cell tower will never effectively prohibit wireless services—unless we consider the restrictions the zoning ordinance more broadly imposes upon siting. Site A might work as a cell tower location, but denial of a permit to build there does not answer why a provider cannot build its tower at Site B or C. To answer that question, we must look to the *ordinance* that restricts siting at B or C or imposes the same permitting requirement at all three sites. For a provider to prove that Sites B and C are unavailable, it must point to the rules that render them so. So long as B and C would function as cell tower sites, their commercial availability is irrelevant: it is the locality's *regulation* that must effectively prohibit construction.

"Regulation" includes rules both written and unwritten. A provider may challenge *how* a state or locality controls siting. That challenge may be based entirely on the text of the local zoning ordinance, or it may be based on how the locality has implemented

its zoning ordinance. A provider could work from individual decisions that "reflect . . . or represent" an unwritten rule that effectively prohibits the provision of services. *Town of Amherst*, 173 F.3d at 14. If the provider can show that permits to build at A, B, and C have been denied, and that permit requests at D, E, and F are likely to face the same fate, it might have a colorable case that the city has a rule amounting to an effective prohibition of services. The burden on a provider bringing an "as-applied" challenge of this sort will be "heavy," *Fairfax Cnty. Bd. of Supervisors*, 672 F.3d at 272 (Agee, J., concurring), but that fact is hardly surprising when the Act "preserves traditional local zoning authority over siting decisions," *MetroPCS*, 400 F.3d at 729 n.6.

Courts that follow the significant gap test have recognized the reality that the Act requires them to look to the rules local governments impose, but those courts have attempted to rework the test itself to avoid this reality. They have debated the second part of the test: whether the proposed site must be the "least intrusive means" or the "only feasible plan" for providing service. *See, e.g.*, *Omnipoint Holdings*, 586 F.3d at 50 n.8 (describing the "only feasible plan" test as requiring that "further reasonable efforts to find another solution are so likely to be fruitless that it is a waste of time even to try" (alterations adopted) (citation and internal quotation marks omitted)); *Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 266 (3d Cir. 2002) (describing the inquiry as whether the proposed tower "is the least intrusive on the values that denial sought to serve" (citation and internal quotation marks omitted)). But whichever test a court applies, the analytical move remains the same:

whether some alternative means of closing the gap *would have been approved* under the zoning ordinance.

Later opinions recognized the tension inherent in this form of analysis. How many alternative sites must a provider investigate and rule out? *See, e.g., Omnipoint Holdings*, 586 F.3d at 51–52. Without some "limit[] on town zoning boards' ability to insist that carriers keep searching," it is hard to imagine how a single denial could ever be proved to effectively prohibit service. *Id.* at 52. Courts solved this problem by arbitrarily reducing the burden upon providers. *See W. Bloomfield*, 691 F.3d at 808 (adopting the "least intrusive means" standard because it is "considerably more flexible" and the "analysis is straightforward"); *Omnipoint Holdings*, 586 F.3d at 52 (concluding that "[a]ny feasibility analysis" must "balance[] . . . competing interests"); *MetroPCS*, 400 F.3d at 734 (choosing a rule based on "policy considerations"). Finding this sort of common-law rulemaking in opinions ostensibly interpreting a statute is a clear signal that something has gone badly wrong in the textual interpretation.

Having considered the ordinary meaning of the term "regulation," the immediate statutory context, and the structural implications of the statute, we conclude that "regulation," as used in subsection (c)(7)(B)(i), means control by rule. Providers mounting an effective prohibition challenge must aim at the zoning rules themselves instead of an individual denial. T-Mobile did not do so.

T-Mobile responds that many courts have "directly addressed" this issue but that no court "in the thirty years since Congress enacted" the Telecommunications Act has adopted our view. It cites several of the same decisions we do and suggests that these courts have not discussed the meaning of "regulation" because "the commonly understood meaning of the language, in context, required no discussion." We are not persuaded.

When Justice Breyer described the requirements that the Act imposed on "local zoning boards" considering "permit applications," he listed only the requirements that they decide them "'within a reasonable period of time,' . . . maintain a 'written record[,]' and give reasons for denials 'in writing.'" *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 128 (2005) (Breyer, J., concurring) (quoting 47 U.S.C. § 332(c)(7)(B)(ii)–(iii)). He did not mention the unreasonable discrimination or effective prohibition provisions. T-Mobile's common-sense reading apparently did not occur to Justice Breyer, nor to the three justices who joined his opinion. Nor does it make sense to us.

T-Mobile points to subsection (c)(7)(B)(v), which grants a right of action to a provider "affected by any final action or failure to act . . . inconsistent with this subparagraph." In its reading, because an "action" may be inconsistent with the requirements of subsection (c)(7)(B), an individual zoning decision must be able to violate any of the provisions of the subsection. But an individual decision could be "inconsistent with" the subsection because it ap-

plied a regulation that was itself inconsistent with one of the subsection's substantive requirements. Challenging that decision requires a provider to prove, for subsection (c)(7)(B)(i), that the rule itself violated the statute. *Cf. Sackett v. EPA*, 566 U.S. 120, 122–27 (2012) (holding that a compliance order was a "final agency action," *see* 5 U.S.C. § 704, and allowing the plaintiffs to litigate the meaning of "navigable waters" under the Clean Water Act).

Nor should we be surprised that the Act includes a final action requirement. Zoning ordinances ordinarily grant broad discretion to zoning boards: they can grant permits to build otherwise unlawful structures, as here, and they can grant variances from otherwise applicable zoning rules. *See Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 187–88 (1985) (explaining that a Takings Clause challenge was not ripe because the developer had not applied for variances from the ordinance). Because zoning ordinances often allow zoning boards to dispense with their requirements in particular cases, Congress elected to conserve judicial resources by requiring providers in most cases to ask municipalities for exceptions to their rules before federally challenging those rules. That choice makes sense in the light of Congress's express goal of "[p]reserv[ing] . . . local zoning authority," 47 U.S.C. § 332(c)(7), and providing only "limited remedies" in federal court. *Abrams*, 544 U.S. at 127.

T-Mobile also points us to what it maintains are two other uses of the phrase "the regulation of" in the Act. But the two sec-

tions it cites pre-date the Act. The first, 47 U.S.C. § 555a(a), was enacted in 1992. *See* Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, § 24(a), 106 Stat. 1460, 1500. And the other, 47 U.S.C. § 533(d), was enacted even earlier in 1984. *See* Cable Communications Policy Act of 1984, Pub. L. No. 98-549, § 2, 98 Stat. 2779, 2785. These sections are nevertheless relevant to our analysis, as they "deal[] with the same subject," and "should if possible be interpreted harmoniously." SCALIA & GARNER, *supra*, § 39, at 252.

T-Mobile fails to explain how these related statutes carry the meaning it suggests. It first points to section 555a(a), which prohibits providers from suing local governments for damages "arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise." 47 U.S.C. § 555a(a). Yet section 555a could reasonably be read to use the phrase "the regulation of" to mean control by rule. T-Mobile cites a decision it contends interprets the phrase to reach a locality's denial of an individual request. But the decision does not clearly do so. In *Jones Intercable of San Diego, Inc. v. City of Chula Vista*, the Ninth Circuit held that a city's denial of permits to lay cable in its borders was the "regulation of cable service." *See* 80 F.3d 320, 323–24 (9th Cir. 1996) (citation and internal quotation marks omitted). But the facts were markedly different: the city had required the cable company to "obtain[] a city-wide franchise" before it could obtain *any* permits. *Id.* at 324. Under our interpretation, this general requirement would amount to a rule.

Nor does section 533(d), which disallows state and local governments from "prohibit[ing] the ownership or control of a cable system by any person because of such person's ownership or control of any other media of mass communications," alter our analysis. 47 U.S.C. § 533(d). "Regulation of" is used only in the section title, not in the text, and the single district court opinion T-Mobile cites does not interpret the phrase as used in the section title. *See Cable Ala. Corp. v. City of Huntsville*, 768 F. Supp. 1484, 1500–01 (N.D. Ala. 1991).

T-Mobile also directs us to another provision, *see* 47 U.S.C. § 253, of the 1996 Act. *See* § 101(a), 110 Stat. at 70. Section 253 bans states and localities from adopting "statute[s] or regulation[s]" that "prohibit or have the effect of prohibiting" the provision of telecommunications services. 47 U.S.C. § 253(a). Because it lacks the explicit limitation found in section 332(c)(7)(B)(v), some courts have construed subsection 253 to allow facial challenges to local ordinances. *See Sprint Telephony PCS, L.P. v. County of San Diego*, 490 F.3d 700, 714 (9th Cir. 2007).

T-Mobile argues that because this section allows facial challenges to regulations that "prohibit or have the effect of prohibiting" services, we should not interpret subsection (c)(7)(B)(i)(II) to do the same. But unlike subsection (c)(7)(B), section 253 does not contain an express right of action. Instead, it allows the Federal Communications Commission to preempt impermissible regulations. 47 U.S.C. § 253(d). To be sure, we have read section 253 to provide an implied private right of action based on its legislative

history. *See BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1191 (11th Cir. 2001). But even that implied right of action reaches only violations of subsection (a) that "potentially implicat[e] subsection (c)," *id.*, which guarantees the rights of state and local governments to "manage the public rights-of-way." 47 U.S.C. § 253(c). Under our precedent, section 253 permits only a subcategory of facial challenges to local ordinances; it cannot replace challenges under subsection 332(c)(7)(B).

T-Mobile also argues that it is telling that section 253 uses the term "regulation" in a different form than section 332. Section 253(a) lists "regulation" alongside "statute" and "legal requirement." T-Mobile suggests that this divergent use of "regulation"—not as the nominalization of regulate, but as a concept synonymous with "rule"—tells us that we should read section 332 differently. But as we have explained, "regulate" itself connotes control by rule. Changing that verb to a noun, in "the regulation of," changes its meaning only to *the* control by rule. And if anything, the term is less precise as used in section 253. After all, the appropriate meaning used there includes "[a] rule or *order*, having legal force." *Regulation*, BLACK'S LAW DICTIONARY, *supra* (emphasis added); *see also Regulation*, WEBSTER'S THIRD, *supra*, 1913 (defining "regulation" as "a rule or order having the force of law"). The proper construction of section 253 is a task for another day, but it seems to us that the textual argument to include as "regulations" the individual orders denying permits is stronger under section 253 than section 332.

Finally, T-Mobile argues that our interpretation would vitiate the Act. It fears that a locality could draft an ordinance so broad, and commit so much to decisionmakers' discretion, that a provider could never bring a substantive challenge under subsection (c)(7)(B). We remain unpersuaded.

There are at least two problems with this argument. First, even if that outcome would follow from our interpretation, it falls to Congress to "amend the statute to conform it to its intent." *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004). Second, in any event, a city's "regulation" of siting decisions is not limited to what is contained in a zoning ordinance. Unwritten rules applied in individual decisions too are susceptible to challenge. If a provider can prove that an ordinance's facially permissive siting requirements are a fig leaf for an effective prohibition, it may challenge that prohibition in federal court. But it may not challenge individual decisions on the ground that a single denial of a request to build a cell tower itself is an effective prohibition: that mechanism is foreign to the law Congress enacted.

Our interpretation of the Telecommunications Act is irreconcilable with any version of the significant gap test, including the version the district court applied. For the last several years, the parties have litigated under incorrect assumptions about the law. We remand this case to the district court to provide the parties with the opportunity to develop the facts and apply the correct law in the first instance. *See Martin v. United States*, 145 S. Ct. 1689, 1703 (2025).

## IV. CONCLUSION

We **VACATE** the judgment and **REMAND** to the district court for further proceedings consistent with this opinion.